318 So.2d 354

**Roy ROBINSON**

v.

**STATE.**

**4 Div. 357.**

Court of Criminal Appeals of Alabama.

July 29, 1975.

Preston C. Clayton, Eufaula, for appellant.

William J. Baxley, Atty. Gen., and Milton C. Davis, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant was tried and convicted of robbery and the jury fixed his punishment at ninety-nine years in the penitentiary, and in accordance with the verdict of the jury the court sentenced him to the penitentiary for that number of years. He was represented at arraignment and trial by court appointed counsel. He is in this court with a free transcript and trial counsel represents him on this appeal.

On November 23, 1974, Mrs. Brenda Jackson, the lone operator of the Zippy Mart grocery store located on West Barbour Street, in Eufaula, Alabama, was robbed by a Negro man. The time was 6:15 a. m. Mrs. Jackson's hours of employment were from 11:00 at night until 7:00 in the morning. She testified that she went to the restroom and when she

came back she noticed the Negro standing at the back of the store looking at something. She went behind the counter and was facing the front of the store and started signing her time sheet. She stated that the defendant came behind her and grabbed her around her neck and put a knife to her throat and asked her where the money was. She was shown a knife and asked if she could identify that knife, and she replied, "Yes, sir; that is definitely the one."

From the record:

"Q. (Mr. Reeves continuing) All right. After he held you around the neck and held the knife on you, what happened then, please, ma'am?

A. (Witness continuing) Well, he asked me where the money was at and I told him that what we had was in the register which we were nearest to. We have two of them in the store and he obtained some one dollar bills and three five dollar bills out of that register. He then asked me where the rest of the money was and I told him that was all we had. He said, 'I think you are lying', and he pushed me back and moved the mat on the floor—we have a safe in the floor—and he flipped the lid off with his knife and obtained the change bag. It was full of change. I do not know how much change was in there. He obtained that bag and then he left with the bag—"

After the robbery the robber walked out the front door and she went to the front door and saw him go around the side of the building toward the cotton mill. She then contacted the police. Mrs. Jackson was asked to look at the defendant in court and state if there was any doubt that the defendant was the man who robbed her at knife point and she replied, "No, sir; there is no doubt whatsoever."

On cross-examination she was asked if she gave the officers a description of the accused and she stated:

"A. I told them—I told the police that he had on a gray looking sweater with black designs in it. He had a beard and he had a blue toboggan on his head. I described the knife he was carrying, the knife had a blunt edge on it, and that he had on blue jeans and he had a beard on his face."

Mrs. Jackson further testified that she saw the man who robbed her thirty-five or forty minutes later when the police brought the appellant by to the store and she positively identified him as the robber. She said he had a beard on at that time but he was not wearing a beard at trial.

A radio dispatch was given to all police units on duty giving them the description of the suspect just as Mrs. Jackson described him.

Police Officer Porter Jackson responded to the call and talked to Mrs. Jackson. This witness testified that Mrs. Jackson told him that the man who had just robbed her was "a black male approximately five foot, eight inches, a hundred and fifty pounds, approximately. Wearing a blue knit cap with a gray sweater with black crossings and blue jeans." This officer went to his patrol car and dispatched this information to two other units that where in service. The officer then proceeded south on Dale Road in search of the suspect. At approximately 6:45 a. m., on the same day, he found the suspect entering a home at 509½ Earline Street. The officer ordered him to come out of the house with his hands on his head. He noticed that he was apparently tired and was sweating. At that time he was wearing a gray sweater, trousers, shoes, and was bleeding from the right arm. The suspect was placed under arrest, handcuffed and was carried directly back to the Zippy Mart where Mrs. Jackson positively identified him as the robber. When the officer arrested him, he searched his clothing and found seventeen one-dollar bills in his left front pocket. The officer further testified that the suspect had a beard and thick sideburns.

Police Officer Carl Thomas Edmondson testified that he received a radio dispatch

from Officer Jackson giving a description of a suspect who had just robbed the Zippy Mart. The time was 6:17. He started search in the area he though the suspect might be found.

From the record:

"Q. Did you have an occasion to see the defendant?

A. Yes, sir.

Q. Is this him seated here in Court?

A. Yes, sir.

Q. What did you do when you saw him, sir?

A. I saw the subject and I stopped the car and the subject saw me at the same time and he tried to get out of the road. I was searching off of Stevenson Street and had turned on to Bullock Street and as he turned around I saw a knife sticking out of his right rear pocket.

Q. All right. I show you what has been put in as State's Exhibit '1' and ask you if this is the knife?

A. This is the knife.

Q. Now, where was the knife?

A. In his right rear pocket. The blade was sticking up and the handle was down.

Q. After seeing him what, if anything, did he do?

A. He tried to go in the house at 405 Bullock Street. The door was fastened at the time and as I got out of the car I ordered the subject to come back out and told him that I wanted to talk to him. At that time he pulled the weapon out of his pocket and threw the knife at me and it went over my head and he ran across the street. I hollered for him to stop and then I fired upon him.

Q. Did you hit him?

A. Yes, sir.

Q. Where did you hit him?

A. In the right arm, sir. Right back here.

Q. What happened after that?

A. He ran around the house and ran back of the house back across Bullock Street and headed south back across the vacant lot. I picked this knife up out of the yard and I called the other units and we started chasing him. I went around the block onto McKenzie Street and spotted the subject again. He fell over a fence and tried to get in a house and the man wouldn't let him in the house and by that time I was out of the car and on foot and he ran across Earline Street and we lost him into the houses at that time. By that time the other units come and we started a house-to-house search and he was found.

Q. Were you present when he was found? Did you come onto the scene where he was?

A. Yes, sir.

Q. Who found him there? Do you know?

A. Corporal Jackson.

Q. Is that the man that just testified?

A. Yes, sir; I believe so.

Q. Who was there when you arrived? Corporal Jackson and who?

A. Corporal Jackson and an elderly gentleman by the name of Will Brundidge. That is the house that this gentleman was in.

Q. All right. Where was he when you got there?

A. When I got there Corporal Jackson had him in the back of the car.

Q. Could you recognize him as being the same person you had fired upon?

A. Definately. (sic)

Q. Did you check him for any wounds?

A. Corporal Jackson did and advised me he had been wounded.

Q. All right. Where did you take him?

A. At that time he was taken to the Zippy Mart where he was identified by the cashier as being the man that had pulled the knife on her and had robbed her.

Q. Is this the same type sweater he had on on that occasion?

A. That is exactly the same sweater. That is the description of the sweater and the blue jeans.

Q. What about a hat or anything?

A. It was given to us that he had been wearing a hat. When I spotted him he did not have a hat on.

Q. How did you identify him as being the suspect that—

A. From his actions on running and because the fact the knife was sticking out of his pocket and because he threw the knife at me.

Q. All right, sir. Did you accompany him to the hospital?

A. I did, sir.

Q. Who treated him, do you recall?

A. Dr. Whitehurst, I believe.

Q. Did you have an occasion to bring him back and charge him with this offense?

A. We did, sir.

Q. Did you find any money on him on this particular occasion?

A. I found three five dollar bills in his left rear pocket.

MR. REEVES: All right, sir. Your witness."

The witness further testified that the three five dollar bills and the seventeen one-dollar bills together with the knife were placed in a brown manila envelope, sealed, initialed and put in Chief Brown's office under lock and key where it remained until appellant's trial. They were introduced in evidence.

Appellant testified in his behalf and denied that he robbed the Zippy Mart and denied that the officers took seventeen one-dollar bills and three five dollar bills from his pocket. He also denied that he had a knife. He testified that he was in another section of town at the time of the alleged robbery. He offered the testimony of two other witnesses in support of his alibi.

There was no motion to exclude the state's evidence; there was no request for the affirmative charge; there were no exceptions reserved to the court's oral charge to the jury, and there were no adverse rulings on the admission of evidence during the trial. However, after both sides rested appellant's counsel made the following motion:

"I want to move to exclude the identification of the defendant by the witness Brenda Jackson on the grounds that she identified him in custody of the officers, handcuffed in the officers' car alone with no other suspects being present."

This motion was overruled. After the case was submitted to the jury they returned a verdict in *ten* minutes.

Appellant urges this court to reverse the conviction in this case solely on the action of the trial court in overruling his motion to exclude the identification of him by Brenda Jackson when he was brought to the store by police officers a few minutes after the robbery, without any lineup of people present from whom she might choose one, without any counsel, and with no person for her to identify except the man under arrest in handcuffs. He claims this form of identification has been condemned by the Supreme Court of the United States in *Wade v. United States,* 388 U.S. 218, 233–237, 87 S.Ct. 1936–7, 18 L. Ed.2d 1149; *Gilbert v. State of California,*

388 U.S. 263, 275, 87 S.Ct. 1957, 18 L.Ed. 2d 1178; and *Stovall v. Denno,* 388 U.S. 293, 296–300, 87 S.Ct. 1970–71, 18 L.Ed.2d 1199.

We disagree and affirm the judgment of conviction.

In *Cornelius v. State,* 49 Ala.App. 417, 272 So.2d 623, this court held:

"It is now settled law that prompt on-the-scene confrontation is 'consistent with good police work', and does not offend the principles established in the cases relied upon by appellant.

In *Bates v. United States,* 132 U.S.App. D.C. 36, 405 F.2d 1104, Judge Burger, now Chief Justice of the Supreme Court of the United States, writing for the court said:

'There is no prohibition against a viewing of the suspect alone in what is called a "one-man showup" when this occurs near the time of the alleged criminal act; such a course does not tend to bring about misidentification but rather tends under some circumstances to insure accuracy.'

In Bates, Judge Burger further wrote:

'Our review of the circumstances surrounding the apprehension of Appellant and the police conduct which led to his identification satisfies us that the claim that Appellant was denied due process of law is without merit; there was no "substantial likelihood of irreparable misidentification." To the contrary, the police action in returning the suspect to the vicinity of the crime for immediate identification in circumstances such as these fosters the desirable objectives of fresh, accurate identification which in some instances may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing culprit while the trail is fresh. * * *'

The confrontation in this case occurred less than thirty (30) minutes after the robbery.

In *United States ex rel. Cummings v. Zelker,* 455 F.2d 714, the Court of Appeals for the Second Circuit said:

'The confrontation in this case was a reasonable one. When the two suspects were brought to Mrs. Camardella's house, only 30 minutes had elapsed since she reported the crime. It must have been obvious to the witness that the suspects were apprehended solely on the basis of the descriptions given by her to the police. Thus this prompt confrontation was desirable because it served to insure "the immediate release of an innocent suspect and at the same time [to] enable the police to resume the search for the fleeing culprit while the trail is fresh." *Bates v. United States,* 132 U. S.App.D.C. 36, 405 F.2d 1104, 1106 (1968). We view the instant situation as one in which prudent police work necessitated the on-the-spot identification in order to resolve any possible doubts the police may have had when they first took the petitioner into custody.'

See also *United States v. Sanchez,* 2 Cir., 422 F.2d 1198."

In *Russell v. United States,* 133 U.S. App.D.C. 77, 408 F.2d 1280, the court stated:

"Balancing all the doubts left by the mysteries of human perception and recognition, it appears that prompt confrontations in circumstances like those of this case will 'if anything promote fairness, by assuring reliability * *.' This probability, together with the desirability of expeditious release of innocent suspects, presents 'substantial countervailing policy considerations' which we are reluctant to assume the Supreme Court would reject. We therefore conclude, with some hesitation, that *Wade* does not require exclusion of McCann's identification.

This conclusion does not rest on a determination that McCann's identification was in fact especially reliable. It rests instead on a general rule that it is not

improper for the police immediately to return a freshly apprehended suspect to the scene of the crime for identification by one who has seen the culprit minutes before."

In *Biggers v. Tennessee,* 390 U.S. 404, 88 S.Ct. 979, 19 L.Ed.2d 1267, Mr. Justice Douglas, although dissenting, readily conceded:

"Of course, due process is not always violated when the police fail to assemble a lineup but conduct a one-man showup."

We hold that the identification procedure in the patrol car was not such as to create a likelihood of irreparable misidentification.

This cause is due to be affirmed.

Affirmed.

All the Judges concur.