This is an appeal from a judgment of conviction by a Houston County Circuit Court jury, wherein James Alex Speigner was found guilty of rape and sentenced to fifteen years.
A detailed recital of the facts is not necessary since the sufficiency of the evidence is not preserved for review, because appellant did not move to exclude the State's evidence nor for a directed verdict; did not request the affirmative charge, and did not make a motion for a new trial.
Briefly, the facts are as follows:
The victim testified that on July 28, 1976 she was living in the upstairs apartment of a duplex in Dothan, Alabama, and that the downstairs part of the building was unoccupied. She stated that there was a wooded area across the street from the apartment and that there were houses on either side of the building, on each corner of the block.
She recalled that on the night of the incident she was awakened by a noise in the living room. When she got up to see what it was, she saw someone coming through the window of the living room. She immediately screamed, and a man withdrew his leg from the window, shined a flashlight in her face, and told her not to scream or he would burn the house down.
She continued screaming, and, when she told the man she was going to call the police, he answered: ". . . no, you don't have a phone." At that point she inquired how he knew that, and he responded: "He had waited for me the night before, but I had stayed out too late." The victim recalled that, on the previous night, she had noticed that someone had tampered with the door to her apartment.
During the interval that she was talking to the man, he screamed obscenities relating to oral sex. Once she was dressed, she attempted to leave, but he was at the door blocking her exit. She told him to get away from the door but he answered: "There is not but one way out and one way in and I'm going to get what I came for."
She then went to the window and began talking with the man on the ground below. She, at first, refused his request to come outside, but, after realizing that no one could hear her screams, told him she would do so if he would not hurt her. She went to the front porch, and, at his request, sat with her back to him. At that time the man removed what appeared to be "sock-like military gloves," and proceeded to undo her jeans. He told her he was not going to hurt her, but that he "was going to get what he came for." She testified that, at this point, she "talked real ugly" to him and told that he was disgusting. He then said he had made a mistake, that he had the wrong person and would let her go. *Page 41 
She left the porch and attempted to enter the building, but the door had locked. The man offered to get the door open and after the door was opened she went upstairs to get her car keys. When she came back he stated that he had changed his mind. He then instructed her to lie down on the porch and told her to cover her face with her arm. The man removed her jeans and performed cunnilingus upon her, and then had sexual intercourse with her against her will.
The victim testified that during this time she moved her arm and briefly saw the man "full face" and that she saw his face from the nose up for a period of three minutes. She claimed that she was able to see the man's features because the porch was well lighted by a nearby street light.
The victim positively identified the appellant as the man who raped her. She said he had told her that if she tried to go to the police, or if she tried to look at him, he would "hurt me."
 I
Appellant argues that the trial court abused its discretion in denying the motion for a change of venue on the basis of pretrial publicity. He contends such publicity was so extensive and so damning that it violated his due process right to a fair and impartial trial.
At this time a recital of the evidence presented at the hearing on the motion for change of venue would be a mere repetition of the evidence reviewed in Speigner v. State,367 So.2d 590 (Ala.Cr.App. 1978). Although the date of the hearing was approximately three months after the above cited case, the witnesses and testimony presented by appellant were the same.
We adopt the conclusion and the reasoning of Speigner v.State, supra, that change of venue was not warranted.
Further, it is our judgment, based on the facts of the hearing in the present case and the reasoning of Speigner v.State, supra, that appellant did receive a fair and impartial trial at the hands of the jury in Houston County.
 II
The appellant contends that it was error to allow into evidence the pretrial identification made by the victim at the police station. He argues that her in-court identification was compelled by identification of the appellant prior to his arrest. It is his position that the two identifications violated "his rights to due process under the Constitution of the United States and the State of Alabama." Further, he claims that, due to the victim's pretrial identification at the police station, she was predisposed to identify him a second time in court because she had done so earlier.
In our review of the record we can find nothing to indicate that any objection was made concerning the victim's pretrial identification of appellant. However, a motion to suppress identification evidence was made in a previous case involving the same appellant. Speigner v. State, supra. This motion was filed in June, 1977, which motion was subsequently denied. The motion does not appear to have been renewed for the purposes of the trial at bar. Due to the absence of a proper objection to the victim's identification evidence during trial of the present case, there is nothing for this court to review. However, because of the inclusion in the record, of the motion at the previous trial (p. 504), we have examined this insistence of error.
Under Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877,32 L.Ed.2d 411, appellant was not entitled to have counsel present during the pre-arrest identification procedure. Whether the identification testimony is admissible is determined by the procedure used in obtaining the identification and whether it was so impermissibly suggestive as to create a substantial risk of misidentification. Robinson v. State, 55 Ala. App. 658,318 So.2d 354. In determining this issue we examined the totality of the circumstances surrounding the identification procedures.Stovall v. Deno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199. Under this "totality of circumstances" test, the factors to be considered in evaluating the likelihood of misidentification *Page 42 
include; (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; and (4) the level of certainty demonstrated by the witness at the confrontation. Neil v. Biggers,409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401; Robinson v. State,45 Ala. App. 236, 228 So.2d 850.
However, in determining the constitutional adequacy of the pretrial identification, along with the admissibility of the identification testimony, the central question is whether, under the totality of the circumstances test, the identification was reliable. Manson v. Brathwaite, 432 U.S. 98,97 S.Ct. 2243, 53 L.Ed.2d 140.
Further, where allegations are made that the due process standards were violated by an unfair pretrial confrontation, it becomes the burden of the prosecution to show by clear and convincing evidence that the in-court identification testimony had an independent source and did not stem from the alleged unfair pretrial confrontation. United States v. Wade,388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149.
The record in this case indicates that the entire incident which concluded with the sexual assault, lasted approximately two hours. Further, that, during the time of the sexual assault, the victim saw her assailant "full-face", and that she viewed his face from the nose up for a period of approximately three minutes. Also, there was testimony which indicated that the porch where the sexual attack occurred was well lighted.
The victim testified that she had looked at photographs of suspects at the police station on the night of the assault and on later occasions. In all, she estimated that she had viewed a total of one hundred photographs on ten occasions prior to the time she identified appellant at the police station. She stated that at no time during the occasions on which she had viewed the photographs did she see the appellant's picture. Further, she had not identified anyone else as her assailant prior to her identification of appellant.
On the day the victim was shown a picture of the appellant by the police, she commented that it looked like her assailant, but that she was not positive and would have to see the man to be sure. According to her testimony, the police told her they had someone in custody they wanted her to see but they did not tell her it was the same man whose photo she had identified. She accompanied the police to a one-way mirror and saw the appellant in a room with a Lt. Stokes. She then asked to see the man's hands, and when she entered the room she overheard his voice.
The victim stated that, when she saw the man in person, "I recognized his face."
On cross-examination, she was asked if she had told any police officer about the "crooked little finger on the man's right hand." She responded, "I did tell them that it was something, that I would remember his hands if I saw them. And I did."
During the trial, counsel for appellant inquired about the ring finger on appellant's left hand. Appellant responded that it was "stiff."
The victim's testimony indicated that, when she reported the assault to the police officers, she also gave them a physical description of her assailant, including his height, weight, and physical build, as well as the color, length, texture, and style of his hair, the size of his hands, and the amount of hair on his arms. She also described his clothes, jewelry, and his immaculately shined shoes.
Under the above circumstances surrounding the pretrial identification, we do not find that the police used any overly suggestive means to prompt the identification. She was allowed to view the person, listen to his voice, and look at his hands. The victim's "one-on-one" identification of appellant was positive and unhesitating. This alone is not enough to render the identification unreliable. Stovall v. Deno, supra.
Upon considering the circumstances surrounding the victim's in-court identification, *Page 43 
we find it to have had an independent source sufficient to satisfy the rule under U.S. v. Wade, supra, and that the admission of the pretrial identification did not violate the appellant's constitutional rights. Neil v. Biggers,409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401.
 III
Appellant maintains that the court committed reversible error in allowing the prosecution to argue in a manner that impermissibly shifted the burden of proof to the defendant.
The portion of the argument that appellant complains of reads as follows:
 "Look at this: She looked him full in the face at close range for three minutes; and then she saw him thereafter, partially, from here up. (Indicating) She listened to his voice for an hour. She described him to the police. The only exception, with it being straight on the top. If a person has got their hair like that, how are you going to describe it? If it's curly like that? Same weight. Same height. Same age range. He was wearing a watch on his right arm. And I submit to you, that's just no coincidence. Whether it was this watch or any other watch. If a man who attacks you is wearing a watch on his right arm. And lo and behold, James Speigner also wears a watch on his right arm.
 "She testified that she looked at picture after picture and picture, and refused, and refused, and refused to identify anybody, because she is not going to identify anybody but the man who did this thing to her. And it's James Alex Speigner, sitting right here at this table. Now, she says he is the one that did it, and I am positive. Here's all these reasons why he's the man that did it. She carried a picture of him around in her mind all of that time, she dreamed about it, she would never forget him. She saw him at close range. Now, what have you got to put a reasonable doubt in your mind? You've got the fact that his mama and daddy gave him a watch for Christmas. And that's the watch. There's no testimony whatsoever —
 "MR. SMITH: Now, I object to, `What have you got to put a reasonable doubt in your mind.'
 "MR. SORRELLS: I didn't say they had to put a reasonable doubt in their mind, I'm just asking them to look at the evidence.
 "THE COURT: I think that is within the limits of argument. Go ahead.
 "MR. SMITH: But the burden is the other way, Your Honor.
 "MR. SORRELLS: I am not putting any burden on them, Judge.
 "THE COURT: I think that's within the limits of argument.
 "MR. SORRELLS: There was testimony that the mama bought him the watch, but there is no testimony that this is the watch that the man was wearing? They never asked Miss . . . is this the watch the man was wearing? Or did you observe this watch on him down at the police station? Mr. Harrison said to you that they got the watch away from him immediately upon his being hired. And the defendant testified that he was wearing this watch on his right arm at the preliminary hearing. I submit to you, that people have watches, and they have watches. They asked what kind of watch was it, and she said an older watch. And by coincidence, on his right arm. Is that some reason to doubt her identification? I submit to you that it wasn't."
The appellant argues in his brief that the above quoted portion of the prosecution's closing argument, coupled with the court's definition of reasonable doubt, prompted the jury to believe that appellant had the burden of presenting proof showing that a reasonable doubt existed.
However, there was no objection made to the court's oral charge and its definition of reasonable doubt. Therefore this particular point is not reviewable. Zuck v. State, Ala.Cr.App.,331 So.2d 777.
Control of closing arguments rests in the broad discretion of the trial judge. Elston *Page 44 v. State, 56 Ala. App. 299, 321 So.2d 264. In summation arguments to the jury, counsel may comment, draw proper inferences, and present their conclusions from the evidence presented. Borden v. State, Ala.Cr.App., 337 So.2d 1388. Counsel is also allowed to draw deductions from the trial evidence. Espey v. State, 270 Ala. 669, 120 So.2d 904; Summersv. State, Ala.Cr.App., 348 So.2d 1126.
The Alabama Supreme Court in Beecher v. State, 294 Ala. 674,320 So.2d 727, held that the prosecution has the right to point out that the State's evidence stands uncontradicted and that there is no evidence to refute the facts presented by the State, as long as this is not seen as a comment on the defendant's failure to testify. See Swain v. State, 275 Ala. 508, 156 So.2d 368: Richardson v. State, Ala.Cr.App.,354 So.2d 1193. In addition, argument by the prosecution concerning omissions and inconsistencies in the defendant's version of the case is not improper. Jackson v. State, 41 Ala. App. 325,133 So.2d 207.
Our interpretation of the argument in question leads us to conclude that the prosecution was not attempting to shift the burden of proof, but was merely making the point that the State's case had not been undermined. Nonetheless, the court's oral charge should have removed any doubt concerning who had the burden of proof. Under these circumstances the trial court was not in error in allowing such argument.
 IV
The appellant insists not only that the procedures surrounding the return of the verdict were improper, but that the imposition of punishment by the jury was also in error and requires reversal.
From the record we find the following circumstances surrounding the taking of the verdict.
During the court's oral charge the jury was instructed:
 "Ladies and gentlemen of the jury, after you have weighed and considered all of the testimony in the case, that for the State and that for the defendant, if you are convinced beyond all reasonable doubt that the defendant is guilty of rape, then you should find the defendant guilty of rape. And, in that event, the form of your verdict would be — and you have two forms which you might use — one would be, `We, the jury find the defendant, James Alex Speigner, guilty of rape as charged in the indictment.' Then you would say, `We fix his punishment at imprisonment in the penitentiary for the term of his natural life.' Another verdict that you could render would be, `We, the jury find the defendant, James Alex Speigner, guilty of rape as charged in the indictment. We fix his punishment at imprisonment in the penitentiary for so many years.' Any number of years from ten on up. Ten being the lower limit. Ten on up. Those should be the two forms of verdicts, either one, that you might render, if you are convinced, beyond all reasonable doubt, that the defendant is guilty of rape as charged in the indictment."
The jury retired but returned before reaching a verdict and asked the court for instructions, as follows:
 "FOREMAN: If we should give any number of years, if we found a person guilty, if that person was given by us a certain number of years, how much time would he have to serve before he would be eligible for parole?
 "THE COURT: You may have a seat. That's something that is not for your consideration in your deliberations in this case. And I am not privileged to give you that information. I am sorry. You may now go back to the jury room, if that's all the instructions you wanted."
The jury then resumed its deliberations and returned with a verdict that was deemed improper by the court. The court then instructed them as follows:
 "THE COURT: Now, ladies and gentlemen, this is not a proper verdict. You cannot put any provisions on the sentence that you give. I will send you back to the jury room in order for you to render a correct verdict." *Page 45 
After making this statement, the court again sent the jury back to the jury room in order that they might reach a correct verdict.
The appellant complains that the initial verdict, in which the jury fixed punishment at ten years without parole was an improper verdict, and argues the above admonition given to the jury, that they could not place any provisions on their sentence, was fundamentally erroneous.
We note that there was no defense objection, nor was there a request for a mistrial during reception of the verdict, and without some express objection or ruling adverse to the defendant, this court has nothing to review. Harris v. State, Ala.Cr.App., 347 So.2d 1363.
Appellant points out that under § 13-1-130, Code of Alabama 1975, there is no express provision fixing the duty of imposing punishment on the jury. Section 13-1-130 provides:
 "Any person who is guilty of a crime of rape shall, on conviction, be punished by imprisonment in the penitentiary for not less than ten years, or as otherwise specified by law."
The appellant complains that the fixing of punishment by the jury was error and that under § 15-18-20, Code of Alabama 1975, it is the duty of the court to fix punishment. Section 15-18-20
provides:
 "When an offense is punishable by imprisonment in the penitentiary or hard labor for the county, the court must impose punishment, unless the power is expressly conferred on the jury."
In the present case the appellant was convicted on October 25, 1977 after a two-day trial. At that time §§ 13-1-130 and15-18-20, Code of Alabama 1975 were not in effect. The statute in force at the time of appellant's trial was T. 14, § 395, Code of Alabama 1940, Recompiled 1958, which empowered the jury to fix punishment in a rape case. Therefore, at the time of the trial on October 24th and sentencing on October 25, 1977, the jury was empowered to set punishment at a term of not less than ten years and no more than life imprisonment. For this reason, and in view of the ruling set forth in Harris v. State, supra, had there been error it would not have been reviewable.
However, at no point in the reception of the jury's verdict or in the trial judge's instructions to the jury did the appellant interpose any type of objection.
In Hayes v. State, 44 Ala. App. 499, 214 So.2d 708, this court stated that a jury has a right to amend or cancel its verdict at any time prior to its discharge. It has also held that both favorable and unfavorable recommendations added to a verdict by a jury are to be disregarded as surplusage and do not render the verdict invalid. Freeland v. State, 41 Ala. App. 480,136 So.2d 892 (holding that the addition of the words "jury recommend no pardon" to the verdict did not render it invalid).
The trial judge was thus incorrect in his instructions to the jury on this matter and in asking them to return to the jury room to render a correct verdict. The verdict and sentence of ten years were correct as rendered, and the additional provision placed thereon by the jury should have been regarded a surplusage. We therefore remand this cause to the trial court in order that a proper sentence may be entered. Osner v. State,54 Ala. App. 520, 310 So.2d 241.
We have examined the record of transcript in this case and find that the judgment of conviction is due to be affirmed and the cause remanded for proper sentencing.
AFFIRMED. REMANDED FOR PROPER SENTENCE.
All the Judges concur. *Page 46