The appellant, David Leon Garth, was convicted of first-degree burglary, in violation of § 13A-7-5, Code ofAlabama 1975, and was subsequently sentenced to serve ninety-nine years in the State penitentiary. Four issues are raised on appeal.
The evidence presented by the State tended to establish that on June 12, 1986, Mike Wilson, his wife Cathy, and their small child were living in a two-bedroom apartment at the West Court Apartments in Decatur. A friend, Jerry Jackson, was also living with them at the time. That night, Jerry went to bed sometime between 10:00 and 11:00 p.m. Earlier in the evening, Mike and Cathy had moved their mattress from their bedroom into the living room so as to be near the window fan. They watched television most of the evening until Cathy fell asleep. Around midnight, Mike got up and went to the bathroom. When he went into the bathroom, both bedroom doors were shut. Since they were living in a "rough" neighborhood, Mike had made it a point to check the locks on all of the doors and windows earlier in the evening.
While Mike was in the bathroom, he heard someone in the kitchen open a cabinet door, rattle some glasses, and turn on the water. He assumed it was Jerry. Moments later he heard the front door being opened and closed. He again assumed it was Jerry who was responsible for these noises. When Mike came out of the bathroom, he noticed that the door to his bedroom had been opened. He went into the bedroom and turned on a light. Mike noticed that the curtain had been pulled back from the window, so he went over to investigate. Upon closer inspection, he observed that the bedroom window had been raised 6 or 7 inches. When Mike turned around to go find out from Cathy or Jerry why the window was open, he met face-to-face with a young black man, subsequently identified as the appellant. Appellant was standing behind a gun pointed at Mike's head. Mike yelled, "Oh, God, No!" Appellant then pointed the gun at Mike, pulled the hammer back, and cocked it. Mike threw open the window, dove out head first, and ran to a friend's house to call for help.
Cathy was awakened by her husband's yelling and could tell something had frightened him. She sat up and, by the combined light of the television screen and the bedroom light, was able to see a black man standing with his back to her facing the bedroom window. She immediately noticed that he had a "funny looking haircut" that was "very short on the sides and long on top." The black man, again identified as the appellant, turned around and walked through the living room directly by her, and out the front door.
Jerry Jackson was also awakened by the noise and heard Mike yell. When he came into the living room, he saw Cathy sitting *Page 175 
up and also saw the front door close. He opened the front door and stepped outside. Patrolman Darby of the Decatur Police Department, responding to Mike's call, met Jerry as he opened the door. The officer was then given a description of the burglar, which he broadcast over the police radio.
Patrolman Curtis, also of the Decatur Police Department, was on routine patrol when he heard this broadcast. He was within a mile of the victims' apartment when he observed two individuals walking through a field some 75-100 yards away. Patrolman Curtis directed the spot light of his patrol car on the subjects and observed a black male, the appellant, who matched the general description of the suspect in the West Court incident. Accompanying the black male was his girlfriend, Diane Marie Bates Bailey.
When the appellant saw the police pull up, he told his girlfriend, "Oh, I got this gun." Patrolman Curtis approached appellant and his girlfriend on foot, identified himself as a police officer, and asked if they would identify themselves. They did so, whereupon the officer radioed for assistance. When assistance arrived, Patrolman Curtis informed appellant of hisMiranda rights. He then informed appellant about the West Court incident, and asked if he and his girlfriend would voluntarily go with him to the apartment complex. They agreed to do so. Once they arrived at the West Court apartments, appellant told his girlfriend to tell the police that they had been together since 11:00 p.m., even though she did not see him until midnight.
Mike Wilson saw appellant seated in the back of the patrol car. He was unsure at this point of the identification, and asked if the appellant could get out of the car so that he could see him more clearly. Once appellant got out of the car, Mike positively identified him as the man who had been in his apartment not more than 15 minutes earlier. At that same time, Cathy Wilson also identified appellant, and stated that she was "very sure" that he was the man who had just been in her apartment. Appellant was taken into custody for questioning, but was later released. Later that night, Mike and Cathy Wilson went to police headquarters to look at a photographic lineup. Both Mike and Cathy separately selected appellant's photograph as that of the person they had seen in their apartment that evening. Appellant was arrested around 9:00 a.m. on June 13, 1986, and charged with burglary in the first degree.
 I
Appellant first contends that the face-to-face confrontation and positive identification of him by his victims shortly after the burglary were unnecessarily suggestive and violative of his due process rights.
Initially, we note that a timely objection to testimony concerning this identification was not made at trial, nor was there a motion to suppress this evidence. Review of legal issues on appeal is limited to those questions which are timely raised at the trial level. Dixon v. State, 476 So.2d 1236, 1239
(Ala.Cr.App. 1985). Accordingly, this issue has not been preserved for review on appeal.
Even if this issue had been preserved for our review, it would fail on its merits. This issue was recently addressed by us in the case of Allison v. State, 485 So.2d 799, 801
(Ala.Cr.App. 1986), wherein we held as follows:
 "The only issue raised by appellant on appeal is whether the show-up conducted by the police was unduly suggestive. 'In determining the constitutional adequacy of pretrial identification, the central question is whether, under the totality of the circumstances, the identification was reliable.' Brazell v. State, 369 So.2d 25, 28 (Ala.Cr.App. 1978). One man show-ups are, by their very nature, suggestive. Weatherford v. State, 369 So.2d 863 (Ala.Cr.App. 1979), cert. denied, 369 So.2d 873 (Ala. 1979). However, this does not necessarily mean that show-ups are unduly
suggestive. Cooley v. State, 439 So.2d 193
(Ala.Cr.App. 1983). Alabama case law has consistently recognized that one man show-ups are an important part of efficient police work and generally show how well the police do their job. *Page 176 
Conducted as soon as possible after the commission of the crime, they are a reliable, accurate, and constitutionally acceptable identification procedure. Hobbs v. State, 401 So.2d 276
(Ala.Cr.App. 1981); Carter v. State, 340 So.2d 94
(Ala.Cr.App. 1976); Robinson v. State, 55 Ala. App. 658, 318 So.2d 354 (Ala.Cr.App. 1975); see also, Bates v. United States, 132 U.S.App.D.C. 36, 405 F.2d 1104 (1968). An identification deprives the accused of due process of law only where the procedure used is so 'impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968). Factors which should be considered in determining whether there is a substantial likelihood of irreparable misidentification include 'the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.' Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972)."
See also, O'Dell v. State, 482 So.2d 1341, 1346-47 (Ala.Cr.App. 1985).
In the instant case, appellant was taken back to the scene of the crime within 15 to 20 minutes of the burglary. Both Mr. and Mrs. Wilson were able to positively identify appellant as the one who had been inside their apartment just minutes earlier. His unusual haircut, and the details concerning the appellant's clothes, were just as the victims had described them to the police. Under the "totality of the circumstances," it is clear that this "show-up" yielded an accurate, yet not unduly suggestive, identification of the appellant. Therefore, no error occurred in allowing the results of this identification into evidence.
 II
Appellant next contends that the trial court abused its discretion by refusing to allow defense counsel to impeach his own witness on the basis of "surprise."
A party who has been surprised by a witness may lead or cross-examine that witness in order to refresh the witness's recollection or to show the surprise of the party who has called the witness. Chandler v. State, 443 So.2d 1333, 1334-35
(Ala.Cr.App. 1983); Randolph v. State, 331 So.2d 766, 770
(Ala.Cr.App.), cert. denied, 331 So.2d 771 (Ala. 1976), appealafter remand, 348 So.2d 858 (Ala.Cr.App.), cert. denied,348 So.2d 867 (Ala. 1977). Counsel may not impeach such a witness, however, by calling other witnesses to testify as to the witness's prior inconsistent statements. Chandler, supra, 443 So.2d at 1335; Randolph, supra, 331 So.2d at 770. Seealso, C. Gamble, McElroy's Alabama Evidence § 165.01(7) (3d ed. 1977).
Our examination of the record in the instant case reflects that appellant's defense counsel was, in fact, permitted to impeach his witness. The trial court allowed counsel to introduce the prior inconsistent statements of the witness who had "surprised" him. Moreover, the trial judge correctly refused to allow counsel to impeach him by calling other witnesses. We further note that certain of the adverse rulings suffered by defense counsel were proper, as the questions propounded by defense counsel constituted testimony on the matter at hand, rather than questions directed at the witness on the stand. Therefore, the trial court was not in error in restricting the extent of defense counsel's impeachment of his witness.
 III
Appellant also contends that the trial court erred in failing to provide defense counsel with a copy of his pre-sentence report prior to sentencing.
The record reflects that the trial judge initially sentenced appellant after a jury returned its guilty verdict against the appellant. However, a second sentence hearing was held one week later due to the trial court's failure to provide defense counsel with a pre-sentence report before the initial sentencing. Our examination of the record reveals that at this second sentence hearing *Page 177 
the appellant did, in fact, have a copy of his pre-sentence report. Thus, the trial court corrected its own error by conducting a second sentence hearing after appellant's counsel was provided a copy of his client's pre-sentence report. Rule 45, A.R.A.P.
Appellant also complains that once he was given a copy of his pre-sentence report, he was not given sufficient time to study the report to see if it contained any innaccurate or otherwise inadmissible information. The amount of time to be given the appellant in his preparation to show a flaw in a presentence report is a matter which is left to the discretion of the trial judge. See Humber v. State, 481 So.2d 452, 453 (Ala.Cr.App. 1985).
Additionally, there has been no showing of any mitigating factors which appellant might introduce at yet another sentencing hearing, should we be inclined to grant one. Absent some showing that the outcome of a new hearing would be materially different, the harmless error rule would apply.Ex parte Glover, 508 So.2d 218, 220 (Ala. 1987). As any error committed in the sentencing phase of appellant's trial was harmless, the sentence imposed by the trial court must be affirmed.
 IV
Appellant's final contention of error is that the trial court abused its discretion in refusing to approve payment of expenses of an expert on "Home Race Bias." Appellant complains that the disallowance of such expenses precluded his defense counsel from rendering an adequate defense.
According to appellant, "Home Race Bias" is the theory that individuals of one race have difficulty in identifying individuals of another race. The victims involved in the instant case were white, while the appellant was black. Since appellant's defense was based on a theory of misidentification by the victims, appellant contends that it was unreasonable for the trial judge to refuse to approve the cost of hiring an expert on this subject.
"A defendant may have a right to the appointment by the State of an expert where it is shown to be necessary for an adequate defense." Whisenhant v. State, 482 So.2d 1225, 1229
(Ala.Cr.App. 1982), aff'd in part and remanded in part,482 So.2d 1241 (Ala.), on remand, 482 So.2d 1246 (Ala.Cr.App. 1983), reversed and remanded on other grounds, 482 So.2d 1247
(Ala.), on remand, 482 So.2d 1249 (Ala.Cr.App. 1984), appealafter remand, [Ms. 1 Div. 333, August 23, 1988] (Ala.Cr.App. 1988). Where there is no bona fide doubt as to a particular issue in a case, the appointment of an expert on that issue would not be justified. See, e.g., Wagner v. State,489 So.2d 623, 629 (Ala.Cr.App. 1985).
Here, the identification of the appellant was not based on race per se, but rather on the unusual hair style and the type of clothing which the burglar was wearing. The trial court therefore had to determine whether, under these facts, the expenditure of State funds for an expert was reasonable. Willisv. State, 441 So.2d 1030, 1034 (Ala.Cr.App. 1983). We find that such an expense was unreasonable. Defense counsel, after all, was able to cross-examine the victims extensively on the issue of identification and their ability to distinguish one black person from another. Such action would certainly lessen any need for an expert on the matter. The victims' cross-examination alone, absent any further showing of necessity for the expert, would be sufficiently adequate in the presentation of the defense. Expenditure of State funds on an expert social scientist in the matter at hand could do no more than yield superfluous testimony, with no truly bona fide showing of its necessity in light of the aforementioned undisputed facts. Therefore, the trial court correctly determined that an expert on "Home Race Bias" was not necessary for appellant's defense.
For the reasons stated hereinabove, the judgment of the trial court is due to be, and it is hereby, affirmed.
AFFIRMED.
All the Judges concur. *Page 913