**Deborah REED, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee.**

No. 49A02–9603–CR–151.

Court of Appeals of Indiana.

Oct. 28, 1997.

Rehearing Denied Nov. 19, 1997.

Belle T. Choate, Indianapolis, Susan D. Burke, Indianapolis, for Appellant–Defendant.

Jeffrey A. Modisett, Attorney General, John B. Herriman, Deputy Attorney General, Indianapolis, for Appellee.

## OPINION

SULLIVAN, Judge.

Appellant, Deborah Reed (Reed), appeals her conviction for robbery and carrying a handgun without a license.

We affirm.

■ Reed presents three issues for review, which we restate as follows:

1) Whether the trial court erred in denying Reed's discovery requests to have access to and question Officer Humbles about a second photo array not used in the investigation.[1]

2) Whether the trial court erred in denying Reed public funds to hire an expert witness.

3) Whether a jury instruction was erroneously given.

On February 3, 1995, a Village Pantry convenience store was robbed in Indianapolis. Ruth Hineman was working at the store.

Someone entered the store wearing a long coat and a stocking hat pulled over the hair, ears and forehead. The person, standing about three feet from Hineman, demanded money. Hineman complied. The robber then left the store and drove off in a red car.

Hineman drew the picture of robber later that evening and about six weeks later identified Reed from a set of six photographs presented to her by Sergeant Herman Humbles. She subsequently picked Reed out of a lineup.

### Second Photo Array

■ As mentioned, Reed's subpoena duces tecum requested Humbles to bring with him to the deposition "any and all notes, reports, summaries, or other documentation, including any and all photos, pictures, or photo arrays, used or prepared by him in the investigation of the robbery." Record at 43. The State filed a motion to quash the subpoena and requested a protective order preventing Reed from "examining, reviewing, or inquiring into the contents of [the file]." Record at 44. The trial court granted the State's motions. Reed also filed an emergency motion for an order to produce evidence, claiming that Humbles had a second photo array given to him by another detective.[2] The motion was granted.

At trial, and out of the presence of the jury, counsel for Reed requested permission of the court to ask questions of Humbles regarding the second photo array. The court denied the request. Still out of the presence of the jury, Reed's counsel made an offer of proof and engaged Humbles in a line of questioning regarding the second photo ar-

---

1. Reed's original subpoena duces tecum requested the investigating officer bring with him to a deposition all "notes, reports, summaries, or other documentation, including any and all photos, pictures, or photo arrays, used or prepared by him in the investigation of the robbery." Record at 43. However, in appellant's brief, although the summary of her argument complains that the officer's investigative tools should have been made available to her, the actual argument limits itself to a discussion about the fact that "Reed wanted access to and the ability to question Officer Humbles [about] the second photo array." Appellant's Br. at 9. In her reply brief, Reed makes an eloquent seven-page argument about numerous evidentiary rulings. Reply Br. at 1–9. By not including her challenge to the

trial court's various evidentiary rulings in her original brief, Reed has waived these issues on appeal. We will therefore address only whether Reed was improperly denied the ability, at trial, to question the officer concerning the second photo array.

2. In another motion, Reed requested "[a]ll videotapes, films, or still photographs ... of any and all suspects in any cases of robbery in which Deborah Reed was or is a suspect" and "[a]ny photo arrays, whether including the Defendant's picture or not, that have been shown to any witnesses in any of the above-mentioned robberies." Record at 59.

ray. During this questioning, Humbles indicated that the photo array that he used was the one that he had put together using the "X–Image" machine. He claimed that the other photo array must have been given to him by another detective who did his own photo array on the "X–Image" machine. Regardless, he only used the photo array that he created and never used the second photo array.[3]

We note that the trial court has wide latitude with regard to discovery matters. *Nettles v. State* (1991) Ind., 565 N.E.2d 1064. And, the trial court need allow the defendant access to evidence only if such evidence is material to the defense. *Jorgensen v. State* (1991) Ind., 574 N.E.2d 915. Reed's offer of proof did nothing but show that the second photo array had nothing to do with the case. In fact, it seems not to be a part of Humbles' "investigative tools." Apparently, Reed wanted access to information about all robberies in which Reed has possibly been considered the perpetrator in order to find if another suspect fit her description. Apparently, Reed seeks to somehow draw Hineman's identification into question by this extraneous consideration. Such may be the paradigm of a party engaged in a "fishing expedition." There was nothing "material" about the second photo array. The discussion with Humbles indicates that the second group of photos was nothing more than the photograph of Reed as used in his photo array but with different alternative choices. It was not used in the investigation and was in no way exculpatory. The trial court did not err in preventing Reed to question Humbles about the array in the presence of the jury.

### Eyewitness Identification Expert

■ Reed asserts that the trial court erred because it failed to grant funds in order to allow Reed to hire an eyewitness identification expert. Reed concedes that the decision to do so rests within the sound discretion of the trial court. *Hough v. State* (1990) Ind., 560 N.E.2d 511. Reed asserts that her eyewitness expert would have testified as to the broad implications of eyewitness identification and the fact that "particularly in cross-racial identifications ... eyewitness error is the single largest factor leading to false convictions." Appellant's Br. at 10–11.

■ The trial court's decision whether to provide an expert at public expense will not be overturned absent an abuse of discretion. *Jones v. State* (1988) Ind., 524 N.E.2d 1284. The burden is upon the defendant to demonstrate the need for an expert. *Kennedy v. State* (1991) Ind., 578 N.E.2d 633, *cert. denied* (1992) 503 U.S. 921, 112 S.Ct. 1299, 117 L.Ed.2d 521. The determination as to whether an expert is necessary is to be made on a case by case basis. *Schultz v. State* (1986) Ind., 497 N.E.2d 531.

■ It is important to note at the outset that an indigent defendant has no constitutional right to a publicly-funded expert. *See James v. State* (1993) Ind., 613 N.E.2d 15, 21. However, a criminal defendant is entitled to an adequate defense; therefore, an expert must be provided when those services are necessary to such a defense and when the defendant specifies precisely how she will benefit from those requested services. *Scott v. State* (1992) Ind., 593 N.E.2d 198, 200. In *Scott*, our Supreme Court attempted to aid trial courts in determining what expert assistance would be "necessary" for an adequate defense:

Asking whether a particular service is "necessary" to assure an adequate defense begs the question. In attempting to decide what is necessary, a trial court should determine whether the proposed expert's services would bear on an issue which is generally regarded to be within the common experience of the average person, or on one for which expert opinion would be necessary. If the requested services could be performed by counsel, an expert need not be provided. An expert need not be

---

**3.** This discussion, in combination with the fact that the trial court granted Reed's emergency motion for an order to produce evidence, indicates that Reed did have access to the second photo array, therefore narrowing the issue even further. Reed only really complains that she was not allowed the ability to question Humbles about the second photo array in the presence of the jury.

appointed if it is improbable that the proposed expert could demonstrate that which the defendant desires. The appointing of an expert is not necessary when the purpose of the expert appears to be exploratory only.

Another consideration for the trial court is whether the expert services will go toward answering a substantial question or simply an ancillary one. For example, if the State's principal evidence linking the defendant to the crime is sufficiently technical that it is commonly the subject of expert testimony, the trial court should strongly consider providing an expert. *Id.* at 200 (citations omitted). The court went on to note that the trial court could consider the cost of the expert, the complexity of the case and whether the State provided an expert, among other factors.

As the State points out, this was a remarkably simple case. The entire conviction revolved around Hineman's identification. The simplicity of this case, though, tends to indicate that an expert would be extremely helpful to the defense. An expert could testify as to the heart of the matter—what factors could have contributed to Hineman's identification being faulty. However, Reed fails to show, nor are we able to discover, a single case in which a trial court has been required to provide an eyewitness expert at public expense.

To the contrary, we note the overwhelming number of decisions of both state and federal courts, including Indiana, hold that trial courts do not err in not providing funds for such expert assistance or appointing such an expert (and in some cases eyewitness identification expert testimony is not even permitted) *See Utley v. State* (1992) Ind., 589 N.E.2d 232, *cert. denied* (1993) 506 U.S. 1058, 113 S.Ct. 991, 122 L.Ed.2d 142; *Hopkins v. State* (1991) Ind., 582 N.E.2d 345, *reh'g denied; United States v. Labansat* (1996) 9th Cir., 94 F.3d 527, *cert. denied* (1997) — U.S. ——, 117 S.Ct. 1013, 136 L.Ed.2d 890; *United States v. Daniels* (1995) 7th Cir., 64 F.3d 311, *cert. denied* (1996) — U.S. ——, 116 S.Ct. 745, 133 L.Ed.2d 693; *Jackson v. Ylst* (1990) 9th Cir., 921 F.2d 882; *Moore v. Tate* (1989) 6th Cir., 882 F.2d 1107, *reh'g denied;*

*United States v. Brewer* (1986) 9th Cir., 783 F.2d 841, *cert. denied* (1986) 479 U.S. 831, 107 S.Ct. 118, 93 L.Ed.2d 64; *Holland v. State* (1994) Ala.Crim.App., 654 So.2d 77, *cert. denied; Garth v. State* (1988) Ala.Cr. App., 536 So.2d 173; *People v. Gaglione* (1994) 26 Cal.App.4th 1291, 32 Cal.Rptr.2d 169, *review denied, overruled on other grounds, People v. Martinez* (1995) 11 Cal.4th 434, 45 Cal.Rptr.2d 905, 903 P.2d 1037; *People v. Kemp* (1994) Colo.Ct.App., 885 P.2d 260, *cert. denied; State v. Sellars* (1981) 52 N.C.App. 380, 278 S.E.2d 907, *review denied; Commonwealth v. Abdul–Salaam* (1996) 544 Pa. 514, 678 A.2d 342, *cert. denied* (1997) — U.S. ——, 117 S.Ct. 1337, 137 L.Ed.2d 496.

These decisions have been influenced by various factors. In *Hopkins, supra,* 582 N.E.2d at 353, our Supreme Court noted that the abundance of additional evidence against the defendant rendered the failure to provide him with funds "not so prejudicial as to require reversal." *Id.* Likewise in *Utley, supra* 589 N.E.2d at 238–39, the Indiana Supreme Court refused to reverse in light of the fact that several witnesses testified that they saw the defendant and there was other evidence which linked the defendant to the crimes. It appears that this is a case of first impression in Indiana—whether an indigent defendant is entitled to funds for an expert concerning eyewitness identification when she is convicted solely upon the testimony of one witness.

In *Hopkins, supra,* 582 N.E.2d at 353, the Indiana Supreme Court recognized the trend of cases recognizing the "built-in potential for error in eyewitness cases." *Id.* (citation omitted). The court also noted that the admissibility of such expert testimony is favored by the weight of authority. Judge Posner, in *Krist v. Eli Lilly & Co.* (1990) 7th Cir., 897 F.2d 293 pointed out some problems inherent in witness testimony. "An important body of psychological research undermines the lay intuition that confident memories of salient experiences ... are accurate and do not fade with time unless a person's memory has some pathological impairment." *Id.* at 296.

Although not taking issue with the contention that eyewitness accounts are less reliable than once thought, the Seventh Circuit, perhaps too sweepingly, noted in *United States v. Larkin* (1992) 7th Cir., 978 F.2d 964, 971, *cert. denied* (1993) 507 U.S. 935, 113 S.Ct. 1323, 122 L.Ed.2d 709:

"[E]xpert testimony regarding the potential hazards of eyewitness identification—regardless of its reliability—'will not aid the jury because it addresses an issue of which the jury already generally is aware, and it will not contribute to their understanding' of the particular factual issues posed. (citations omitted). These hazards are well within the ken of most lay jurors, and [defendant's] counsel was granted ample opportunity to discuss those hazards and cast doubt upon the witnesses' eyewitness identification of his client."

The holding indicates the view that "experts" do nothing more than highlight the fact that witnesses often misidentify individuals, a concept well within the realm of understanding of the average juror.

The Alabama Court of Appeals noted that an expert was unnecessary because the "[d]efense counsel ... was able to cross-examine the victims extensively on the issue of identification and their ability to distinguish one black person from another." *Garth, supra,* 536 So.2d at 177. Similarly, the court in *Jackson v. Ylst, supra,* 921 F.2d at 886 felt that failure to provide an eyewitness identification expert did not violate the fundamental fairness of the trial because "cross-examination effectively exposes erroneous eyewitness identifications." *Id.; see also Moore v. Tate, supra,* 882 F.2d at 1110–11 (failure to provide an indigent defendant with funds for such an expert was not constitutional error because examination and cross-examination at trial afford the jury adequate opportunity to judge the witness' credibility.)

Finally, the North Carolina Court of Appeals addressed the necessity of providing funds for an eyewitness identification expert in *Sellars, supra,* 52 N.C.App. 380, 278 S.E.2d 907. The court noted that the defendant had made no showing that the expert's testimony would be helpful. The purpose of the testimony:

"was to lay a basis for defendant's argument that *it was possible* that the prosecuting witness made a mistake in her identification of defendant. We do not believe the state is required to pay for expert witnesses whose testimony amounts to generalities and to speculation as to whether those generalities apply to a specific case." *Id.,* 278 S.E.2d at 915.

We are not thoroughly convinced that the average juror is conversant with the likelihood or frequency with which misidentifications are made by seemingly unequivocal eyewitnesses. As observed in *Gaglione, supra,* 32 Cal.Rptr.2d at 174:

"It is undisputed that expert testimony on the psychological factors affecting the reliability of eyewitness testimony is admissible in a criminal case. (citation omitted). The Supreme Court reasoned that information now available about these factors is beyond the common knowledge of the jurors: 'It is doubtless true that from personal experience and intuition all jurors know that an eyewitness identification can be mistaken, and also know the more obvious factors that can affect its accuracy, such as lighting, distance, and duration. It appears from the professional literature, however, that other factors bearing on eyewitness identification may be known only to some jurors, or may be imperfectly understood by many, or may be contrary to the intuitive beliefs of most.'" 32 Cal. Rptr.2d at 174.

Accordingly, we suggest that trial courts might be well advised to permit such expert testimony in order to assist the jury in its evaluation of the evidence. Nevertheless we are reminded that, at least with regard to experts paid from public funds, defendant has the burden of demonstrating that "the services [requested] are *necessary* to assure an adequate defense." *Scott, supra,* 593 N.E.2d at 200. (emphasis supplied). While expert testimony is surely helpful in many cases, it will be truly necessary in far fewer instances. The concept that eyewitness identification is flawed or subject to serious question in a particular instance may be placed within the jury's realm of understanding by

careful cross-examination and by counsel's argument to the jury.[4]

### Jury Instruction

 Reed asserts that the trial court erred by giving the following jury instruction: "A conviction may be sustained by the uncorroborated testimony of a single eyewitness." Record at 399. However, the instruction has been held to be a correct statement of the law, and our Supreme Court has upheld similar jury instructions. *Madden v. State* (1990) Ind., 549 N.E.2d 1030 (DeBruler, J., dissenting); *Criss v. State* (1987) Ind., 512 N.E.2d 858.

 Reed further contends that the trial court erred in not modifying the instruction to read: "That a conviction may be sustained by the uncorroborated testimony of a single eyewitness, if there is sufficient evidence of probative value to support the determination of guilt beyond a reasonable doubt." Record at 401. However, defendant's jury instruction No. Two, which was given, included the language that "the state has the burden of disproving [the defense of alibi] beyond a reasonable doubt." Record at 122. The jury was thus aware that their responsibility was to determine guilt beyond a reasonable doubt. The trial court did not err in refusing to give Reed's modified instruction. *Criss, supra,* 512 N.E.2d at 860.

The judgment is affirmed.

FRIEDLANDER, J., concurs.

STATON, J., concurs with separate opinion.

STATON, Judge, concurring.

I concur. We should not ignore the additional weight that expert testimony is usually given. A long list of credentials and educational qualifications can often overshadow equally credible layman testimony. Physical

or psychological impediments of a witness can be brought to the attention of the jury by the defense counsel without the aid of an expert. Too, surrounding physical circumstances are usually within the experience and knowledge of most jurors. Expert identification testimony is a double edged sword, it can cut or add to credibility. It should only be used to explain those matters beyond the understanding of the jury.

---

4. During the hearing on Reed's motion for funds the trial court asked one of the witnesses:

   Q: Mr. Margerum when you say absolutely essential, what is an eyewitness identification expert ... when you talk about identification being fraught with problems, isn't that something that you as an attorney would argue to the jury?
   A: You would certainly argue it to a jury and uh ... I certainly have on many occasions.

However, an eyewitness expert can testify as to case studies they've performed, tests that they've run. They are qualified certainly as experts in this area. And uh ... they can testify as to the whole psychology of how people go about making misidentifications.
S. Record at 355. Clearly, this is simply the "evening clothes" placed upon a subject within the ken of the jury.