AFTER REMAND FROM ALABAMA SUPREME COURT
This cause was remanded to this court pursuant to the decision of the Alabama Supreme Court in Nichols v. State,624 So.2d 1325 (Ala. 1992), wherein that court held that the appellant was not denied a fair trial because he was unable to discuss the case, before trial, with one of the State's witnesses. Therefore, the remaining issues raised by the appellant will be discussed.
 I
The appellant argues that the trial court erroneously denied his motion for individual voir dire examination of the jury venire. However, the manner of conducting voir dire examination of a venire is a matter within the broad discretion of the trial court. Stringfellow v. State, 485 So.2d 1238, 1240
(Ala.Cr.App. 1986). In this case, the trial court voir dired the 99-member jury panel collectively. It informed the attorneys that individual voir dire examination would be permitted on certain issues. There is no indication in the record that this procedure did not sufficiently uncover any possible prejudice or bias of a juror. United States v. Brooks, 670 F.2d 148 (11th Cir. 1982), cert. denied, 457 U.S. 1124, 102 S.Ct. 2943,73 L.Ed.2d 1339 (1982). Therefore, we find no abuse of discretion by the trial court in denying the appellant's motion for individual voir dire examination of the jury venire.
 II
The appellant argues that his statement should not have been admitted at trial, because, he says, it was given without a knowing, intelligent, and voluntary waiver and was the product of an illegal detention. Specifically, the appellant alleges that he was arrested by a number of police officers, and that he was handcuffed and taken by police officers who were "physically larger" than him to the Mobile Police Department. He states that he was then put into a room with Lt. Williams and Sgt. Reinhart, where he says Lt. Williams threatened his relatives before turning on the tape recorder. He alleges that he was not told that he was a suspect in the victim's murder. He further claims that, during the questioning, Lt. Williams became extremely angry and accused the appellant of lying. Thus, the appellant claims that "[t]he entire atmosphere in which the statement was given" included a great deal of intimidation and fear and therefore led to his will being overborne. He further claims that he had been drinking.
Thus, the appellant does not claim that he was not informed of his rights, pursuant to Miranda v. Arizona, 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), but rather makes claims regarding the voluntariness of his statement.
The record indicates that a hearing was held to determine whether the appellant's statement should be suppressed. At that hearing, Lt. Williams testified that Sgt. Reinhart was present when he took the appellant's statement. He testified that he did not *Page 1331 
offer the appellant any reward or hope of reward and that he did not threaten the appellant or induce him to give a statement in any way. Lt. Williams testified that the appellant did not appear to be intimidated or apprehensive and that he was questioned about his use of alcohol and drugs. After the appellant testified during the suppression hearing, Lt. Williams was recalled. He testified that during the questioning he did not smell alcohol on the appellant and that the appellant did not indicate that he had any difficulty understanding what was happening or being said to him. Lt. Williams denied threatening the appellant's relatives and testified that, although he did ask the appellant for addresses of certain of his relatives, he did so to determine where the appellant lived. Lt. Williams testified that he advised the appellant that he was under arrest for one crime and also that he was a suspect in a murder case.
The trial court's determination that the appellant's statement was voluntary was not manifestly wrong. Tice v.State, 386 So.2d 1180 (Ala.Cr.App.), cert. denied,386 So.2d 1187 (Ala. 1980). Nor was the trial court's determination palpably contrary to the great weight of the evidence, based on the conflicting evidence introduced during the suppression hearing. Watkins v. State, 497 So.2d 1153 (Ala.Cr.App. 1986). Further, a defendant need not be apprised of the charge against him before he can knowingly, intelligently, and voluntarily waive his rights and make a statement. Myers v. State,401 So.2d 288 (Ala.Cr.App. 1981).
The appellant also argues that his arrest was illegal, because the police did not have sufficient probable cause to arrest him, in that the only basis for his arrest was statements made by a girlfriend of the victim. The evidence introduced at trial indicated that before his arrest the appellant was informed by the victim's girlfriend that she last saw the victim leaving to go hunting with the appellant. The appellant returned alone from the hunting trip and told the victim's girlfriend that the victim wanted to sell certain personal belongings in front of a store. The appellant then loaded the victim's video cassette recorder into the victim's Blazer vehicle and left, after having told the victim's girlfriend that he would return to pick her up. However, neither the victim nor the appellant returned. The girlfriend stated that she did not notify the police because the victim's camper trailer and his boat were left in her driveway. She stated that she therefore believed the victim had decided to go to Mobile and would soon return.
In addition, the police had descriptions of a number of the victim's missing items, including guns, rings, gold medallions, gold chains, and watches, from his girlfriend and his sister. Based on that information, Lt. Williams had spoken with an employee of the First Federal Gold and Silver Exchange, concerning the police's search for a gold medallion. Lt. Williams gave the employee a description of the appellant and, later that day, the employee contacted the Mobile Police Department and told them that the appellant was in the business trying to sell a gold medallion. Lt. Williams drove to the business and arrested the appellant. The gold medallion was seized at that time.
This evidence showed that there was sufficient probable cause to justify the appellant's arrest. See, e.g., Hood v. State,598 So.2d 1022 (Ala.Cr.App. 1991); Parker v. State,587 So.2d 1072 (Ala.Cr.App. 1991); Freeman v. State, 586 So.2d 1013
(Ala.Cr.App. 1991).
 III
The appellant argues that the trial court erred in determining that there was insufficient cause to allow the appellant's appointed attorney to withdraw and to appoint another attorney. The court-appointed attorney had filed a motion for leave to withdraw, based on an ethics opinion issued in September 1988, indicating that a conflict of interest existed in a case where one member of a law firm served as a municipal court judge, while another member of that firm represented criminal defendants by court appointment and where city police officers participated in the investigations of those criminal cases.
The record indicates that a hearing was held on the court-appointed attorney's motion. The captain of the Police Department of the City of Opelika testified that a law *Page 1332 
partner of counsel's firm was a municipal court judge for the City of Opelika. He further testified that several Opelika police officers had been sent to the scene of the crime for which the appellant was being tried, but when the location of the victim's body was determined to have been outside the jurisdiction of the City of Opelika, the crime scene was turned over to officials from the Lee County Sheriffs Office. The captain of the Opelika Police Department further testified that the police department had nothing further to do with the investigation.
In denying the motion, the trial court stated:
 I'll note for the record, that this motion was filed with the Court, or filed with the Clerk, on October the 25th. This case has been set for trial on October 31 for some time. So, the motion is filed almost on the eve of trial. This is a most serious case. The number of attorneys who practice law in Lee County available for appointment of criminal cases is somewhat limited. The Court knows that [defense counsel] is a highly ethical attorney and if there had been any question raised in his mind about that as to his representation in this case, I believe he would have brought it to the attention of the Court without the necessity of having been spurred to do that by the ethics opinion. The Defendant has a right to a speedy trial and at some point he has a right to have this case resolved, just as the State does. In view of these facts, and the matters that are set forth here today, the Court is going to respectfully deny your motion for leave to withdraw."
The appellant failed to present any evidence of an actual conflict. The possibility of a conflict of interest does not rise to the level of a Sixth Amendment violation. Smith v.White, 815 F.2d 1401 (11th Cir. 1987), cert. denied,484 U.S. 863, 108 S.Ct. 181, 98 L.Ed.2d 133 (1987). Ex parte Bell,511 So.2d 519, 522 (Ala.Cr.App. 1987). Because there is no actual conflict of interest in the present case, "[t]he accused has the burden of proof and must overcome the 'presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' Strickland v. Washington,466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984)." Id. See also Crawford v. State, 479 So.2d 1349, 1355 (Ala.Cr.App. 1985) (no conflict of interest found where the defendant's trial counsel had formerly served as a municipal judge). Jackson v.State, 502 So.2d 858, 86668 (Ala.Cr.App. 1986) (wherein this court determined on return to remand that defendant's court-appointed attorney's subsequent employment as a part-time assistant district attorney did not constitute a conflict of interest, because the attorney had no connection with the defendant's case after his employment with the district attorney's office.)
In the present case, there was no conflict of interest and the appellant's court-appointed attorney provided the effective assistance of counsel mandated by the law. Strickland v.Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674
(1984).
 IV
The appellant argues that the trial court erred in denying certain discovery motions, which, he argues, should have been granted pursuant to the "open door policy" enunciated in Exparte Monk, 557 So.2d 832 (Ala. 1989). The appellant argues that he was unable to investigate and to prepare adequately for trial, because witnesses were located from Lee County to Baldwin and Mobile Counties. Therefore, he argues, he was denied his rights to due process and to the effective assistance of counsel when the trial court denied his motions requesting professional help in investigating the case, a list of witnesses, the criminal records of potential witnesses, and psychiatric assistance.
The record indicates that the trial court properly denied each of these motions. The appellant's request for psychiatric examination was denied because he failed to make the initial showing required by Ake v. Oklahoma, 470 U.S. 68,105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). There was no indication that the appellant's sanity at the time of the offense was in question, which would have entitled him to psychiatric assistance at the State's expense. The record indicates that the appellant had visited Taylor Hardin Secure Medical Facility but that he had refused *Page 1333 
to cooperate with the medical personnel there.
As to the appellant's request for criminal records of potential witnesses, the trial court had ruled that anything exculpatory was already covered by Brady v. Maryland,373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Furthermore, during the hearing concerning witnesses' credibility, defense counsel noted that a list of State's witnesses was not required under Rule 18.1, A.R.Crim.P.
There is no indication that the appellant suffered any prejudice because of the denial of his motion for professional help to investigate his case. The appellant has failed to make any specific allegations as to what an investigator might have discovered or how such an investigator would have benefitted his case. The prosecution indicated that it had complied withBrady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215
(1963), by disclosing any known evidence favorable to the accused on the issues of guilt and punishment. The appellant has made no allegations that the prosecution violated, or withheld any specific evidence, in violation of Brady v.Maryland.
Although "capital cases by their very nature are sufficiently different from other cases to justify the exercise of judicial authority to order discovery from the prosecution" beyond that required by constitution or by statute, Ex parte Monk,557 So.2d 832, 836-38 (Ala. 1989), because there is no indication of any prejudice to the appellant based on the denial of these motions, the appellant's argument must fail. See Kuenzel v.State, 577 So.2d 474, 520 (Ala.Cr.App. 1990), affirmed,577 So.2d 531 (Ala. 1991), cert. denied, ___ U.S. ___,112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
 V
The appellant argues that the evidence presented by the State was insufficient to sustain his conviction for capital murder. Specifically, he argues that he did not intend to kill the victim and, even if the killing was intentional, it was not committed during the course of a robbery, because the property taken was taken "as an after thought."
Although the appellant argues that the victim was accidentally killed when the gun went off while the victim and appellant were hunting together, the State presented evidence that the victim was shot at close range in the back of the neck. Moreover, witnesses testified that the victim usually carried large amounts of money with him and wore a great deal of jewelry. The record indicates that no jewelry and no money were recovered from the victim's body when it was found. Furthermore, when the victim's missing guns and certain jewelry were recovered from third persons, those persons testified that they had purchased those items from the appellant.
The record indicates that, on the day of the offense, the appellant and the victim were visiting a girlfriend of the victim in Opelika. They arrived at her house driving a Lincoln automobile pulling a boat and a Blazer four-wheel drive vehicle pulling a trailer, all of which belonged to the victim. They also brought with them a video cassette recorder, which also belonged to the victim. On the morning of the offense, the appellant and the victim had gone hunting, but only the appellant returned. When the girlfriend asked about the victim's whereabouts, the appellant responded that the victim had gone to sell socks in front of a store. The girlfriend then watched as the appellant loaded the victim's VCR into the Blazer and heard him say that he was going to take something from the victim's boat. The girlfriend asked the appellant to pick her up in 15 minutes. He indicated that he would, but he never returned. The girlfriend also testified that, after the appellant left, she discovered that her telephone lines had been torn out. The following day, the police arrived at the girlfriend's house, with the victim's driver's license. She was then told that the victim was dead.
Approximately four days later, a deputy with the Baldwin County Sheriffs Department was patrolling the Mobile Causeway when he found the victim's Blazer parked in the State park. Clothing, shoes, tools, and an unexpended bullet and shotgun round were found inside the Blazer. A set of keys were found on the dashboard, as well as a *Page 1334 
medical identification card with the victim's name on it. Two days later, the deputy observed the same Blazer, in the same condition as before, and determined that it had been stolen from Lee County.
The Mobile Police Department had been given a detailed description of the victim's missing property, including guns, rings, medallions, gold chains, and watches. A description of the appellant was also given to Lt. Williams with the Mobile Police Department. Lt. Williams, in the course of his investigation, spoke with an employee at the First Federal Gold and Silver Exchange, concerning the search for one of the gold medallions. The employee was also given a description of the appellant and, later the same day, he notified the Mobile Police Department that the appellant was at the store. Lt. Williams apprehended the appellant at the First Federal Gold and Silver Exchange and took custody of a gold medallion at the same time.
Following the publication of a newspaper article which contained information concerning the search for other missing items of the victim's property, a number of individuals called the police department. These calls led to the recovery of the missing guns, which the appellant, using an alias, had sold to people. Pawn shop owners testified that they had bought certain items of jewelry, matching the description of the victim's missing jewelry, from a man using the same alias as that used by the appellant when he sold the guns. The State also introduced evidence that comparison tests between a known sample of the appellant's handwriting and handwriting samples using the alias showed that the two signatures were written by the same person. Moreover, the appellant's thumb print was found on the victim's recovered Blazer.
Thus, the State presented sufficient evidence from which the jury could reasonably infer that the appellant intended to kill the victim and that the murder was committed "during" a robbery in the first degree. " 'To affirm a finding of a "particularized intent to kill," the jury must be properly charged on the intent to kill issue, and there must be sufficient evidence from which a rational jury could conclude that the defendant possessed the intent to kill.' Ex parteRaines, 429 So.2d 1111, 1113 (Ala. 1982). Both prongs of this test are satisfied in this case." Kennedy v. State,472 So.2d 1092, 1105 (Ala.Cr.App.), affirmed, 472 So.2d 1106 (Ala. 1984), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325
(1985).
Moreover, the evidence presented clearly establishes that the robbery, committed against the victim, was part of the same transaction, which resulted in the victim's death.
 "As the Alabama Supreme Court held in Cobern v. State, 273 Ala. 547, 142 So.2d 869 (1962), 'the fact that the victim was dead at the time the property was taken would not militate [against a finding] of robbery if the intervening time between the murder and the taking formed a continuous chain of events.' Clements v. State, 370 So.2d 708, 713
(Ala.Cr.App. 1978), affirmed in pertinent part, 370 So.2d 723 (Ala. 1979); Clark v. State, 451 So.2d 368, 372 (Ala.Cr.App. 1984). To sustain any other position 'would be tantamount to granting to would be robbers a license to kill their victims prior to robbing them in the hope of avoiding prosecution under the capital felony statute.' Thomas v. State, 460 So.2d 207, 212 (Ala.Cr.App. 1983), affirmed, 460 So.2d 216 (Ala. 1984).
 "Although a robbery committed as a 'mere afterthought' and unrelated to the murder will not sustain a conviction under § 13A-5-40(a)(2) for the capital offense of murder-robbery, see Bufford v. State, [382 So.2d 1162 (Ala.Cr.App.), cert. denied, 382 So.2d 1175 (Ala. 1980)], O'Pry v. State, [642 S.W.2d 748 (Tex.Cr.App. 1981)], the question of a defendant's intent at the time of the commission of the crime is usually an issue for the jury to resolve. Crowe v. State, 435 So.2d 1371, 1379
(Ala.Cr.App. 1983). The jury may infer from the facts and circumstances that the robbery began when the accused attacked the victim and the capital offense was consummated when the defendant took the victim's property and fled. Cobern v. State, 273 Ala. 547, 550, 142 So.2d 869, 871 (1962). . . . *Page 1335 
 "The question this Court must answer is whether 'there was sufficient evidence presented by the State from which the jury could infer that the appellant was guilty of the capital offense charged, beyond a reasonable doubt.' Clark v. State, 451 So.2d 368, 372-73 (Ala.Cr.App. 1984)."
Connolly v. State, 500 So.2d 57, 63 (Ala.Cr.App. 1985), affirmed, 500 So.2d 68 (Ala. 1986).
In the present case, there was sufficient evidence that the appellant committed the crime of murder, as defined by §13A-6-2(a)(1), and that the murder was committed "in the course of or in connection with the commission of, or in immediate flight from the commission of," a robbery or attempted robbery in the first degree, as defined by § 13A-8-41. § 13A-5-39(2).
 VI
The appellant argues that the trial court erred in allowing the State to question him about a prior escape charge. The record indicates that, during the cross-examination of the appellant, he admitted to various prior convictions. Thereafter the following transpired:
 "Q. Any other minor stuff that you didn't tell your lawyer about that you've been convicted of?
"A. Not to the best of my recollection, sir.
"Q. How about escape?
"A. That was a walk-away.
"[DEFENSE COUNSEL]: May I approach the bench?
"THE COURT: Yes, sir.
"[PROSECUTOR]: Pardon me?
"THE WITNESS: That's a walk-away.
"THE COURT: Just a minute. Step up.
 "(Whereupon, the following proceedings were had at the bench, inside the presence but out of the hearing of the jury.)
 "[DEFENSE COUNSEL]: We object to that. That's not a crime involving moral turpitude.
"[PROSECUTOR]: We don't hold it to that reason.
"THE COURT: Overrule the objection."
As the State argues in its brief, that an objection to a question must come before the question is answered in order to be timely; otherwise, a defendant must move to exclude the unfavorable answer. Blair v. State, 549 So.2d 112, 113
(Ala.Cr.App.), cert. denied, 549 So.2d 114 (Ala. 1988), overruled on other grounds, Ex parte Jackson, 590 So.2d 901
(Ala. 1991). The appellant argues in his reply brief that this error constituted "plain error" and therefore should be addressed by this court. However, the appellant in this case did not receive the death sentence and therefore that standard of review is inapplicable. See Rule 45A, A.R.App.P. Biddie v.State, 516 So.2d 846 (Ala. 1987). Therefore, this matter has not been preserved for our review.
 VII
The appellant argues that two of the five veniremembers who were excused for cause because of their opposition to the death penalty were erroneously removed.
 "There are a number of recent United States Supreme Court cases on this point which are controlling authority. The original constitutional yardstick was described in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The Court required that the juror make it unmistakably clear that he would automatically vote against capital punishment and that his feelings would prevent him from making an impartial decision as to guilt. This is no longer the test. Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581
(1980), ruled that only those jurors whose rules on capital punishment would prevent or substantially impair the performance of their duties could be challenged for cause. Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), held that the test for excluding a venireman is whether the juror's views would prevent or substantially impair the performance of his duties in accordance with his instructions and oath. The Court expressly stated that the juror's bias did not have to be proved with unmistakable clarity. Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), stated in part as follows: *Page 1336 
 " 'The precise wording of the question asked of [the venireman] and answer he gave, do not by themselves compel the conclusion that he could not under any circumstances recommend the death penalty. But Witt recognized that "determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." [469] U.S. at [424, 105 S.Ct. at 852]. The trial court, "aided as it undoubtedly was by its assessment of [the venireman's] demeanor," at [434, 105 S.Ct. at 857], was under the obligation to determine whether [the venireman's] views "would prevent or substantially impair the performance of his duties as a juror," id., at [433, 105 S.Ct. at 857]. . . .'
 "The Eleventh Circuit Court of Appeals held in 1983 in McCorquodale v. Balkcom, 721 F.2d 1493
(11th Cir. 1983), cert. denied, 466 U.S. 954, 104 S.Ct. 2161, 80 L.Ed.2d 546 (1984), that a prospective juror who responded to the death penalty questions, 'I don't think I could do it. I really don't,' has made it sufficiently clear that she could not impose the death penalty regardless of the evidence. . . .
 "The Fifth Circuit in Martin v. Maggio, 711 F.2d 1273 (5th Cir. 1983), even held that the following equivocal responses would establish the necessary predicate for disqualification: 'I don't know if I would vote for the death penalty.' and 'I don't know if I could do it.' These are all euphemistic expressions of 'no.' "
Watkins v. State, 509 So.2d 1071, 1073-74 (Ala.Cr.App. 1986), affirmed, 509 So.2d 1074 (Ala. 1987), cert. denied,484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1988). See also Brownlee v.State, 545 So.2d 151, 155-56 (Ala.Cr.App. 1988), affirmed,545 So.2d 166 (Ala. 1989), cert. denied, 493 U.S. 874,110 S.Ct. 208, 107 L.Ed.2d 161 (1989).
The two jurors that the appellant complains of were brought back before the court for follow-up questioning concerning their attitudes on capital punishment. The first of these jurors responded to questioning as follows:
 "THE COURT: Are your feelings against capital punishment sufficiently strong that you would automatically refuse to impose the death sentence, regardless of the evidence in the case?
"[POTENTIAL JUROR]: Yes, I believe so.
 "THE COURT: Are you telling me that you are opposed to capital punishment?
"[POTENTIAL JUROR]: Yes, sir.
 "THE COURT: You are aware that capital punishment is provided for under Alabama law, at this time, aren't you?
"[POTENTIAL JUROR]: Yes, sir.
 "THE COURT: Despite your feelings in opposition to capital punishment would you be able to abide by the existing law and follow conscientiously any instructions that I give you at the end of this case and consider the death penalty as a possible option if the evidence in this case warrants it? Would you be able to do that?
 "[POTENTIAL JUROR]: Sir, I would ask you not to impose that burden upon me.
 "THE COURT: Well, it's not something that any of us seek out, but it is something that the law imposes upon us at times. Are you telling me that you absolutely could not consider the death sentence regardless of the facts?
 "[POTENTIAL JUROR]: Yes, sir, I believe so, it would prejudice me.
"THE COURT: Sir?
 "[POTENTIAL JUROR]: I might be biased and lean one way because of my feelings, if I was forced into it.
 "THE COURT: Are you telling me, that you would automatically vote against the death penalty, no matter what the facts of the case reveal?
 "[POTENTIAL JUROR]: At this moment, that's how I feel.
 "THE COURT: Well, let's assume that the facts in this case were sufficiently bad, that the death penalty is an option; are you telling me that you would absolutely not impose the death penalty regardless of how bad the facts may be?
 "[POTENTIAL JUROR]: In my own conscience, no, I couldn't go along with the death penalty." *Page 1337 
Thereafter, defense counsel asked if the potential juror could vote for the death penalty for the killer if a member of his family were brutally killed, and the potential juror responded that he could not because of religious reasons.
The other potential juror was questioned concerning his opposition to the death sentence as follows:
 "THE COURT: . . . Now, assuming that you were selected to sit on the jury in this case, and at the end of the case I instructed you that the law in Alabama was that the death penalty is a penalty provided by law, do you think you could put aside that personal feeling and follow the law that I gave you and impose the death penalty if the facts were so bad that it was warranted? In other words, what I'm asking you is would you automatically vote against the death penalty regardless of what I told you and regardless of what the facts might be in the case?
"[POTENTIAL JUROR]: Yes or no?
"THE COURT: Yes, yes or no.
"[POTENTIAL JUROR]: I believe so, sir.
 "THE COURT: Well, 'I believe so' is not exactly a yes or no. Are you telling me that you would automatically vote against it, regardless of the facts and regardless of what I might tell you the law is?
"Do you understand what I'm asking you?
 "[POTENTIAL JUROR]: Yes, sir. I'm trying to, uh —
". . . .
 "[POTENTIAL JUROR]: Well, I'm opposed to capital punishment. But I think if a person should be judged by his peers, but I don't think that me, myself, the way that I was brought up to believe that, you know, in Christ and all, that I can honestly say that the man is guilty.
 "THE COURT: Well, it's not a question of whether he's guilty. Let's assume that the State proves that he is guilty. And that it's a terrible crime, and the facts are awful, could you consider imposing capital punishment under those facts, if the Court instructed you, that that is an appropriate punishment or an available punishment?
"[POTENTIAL JUROR]: No."
Thereafter, defense counsel asked the potential juror whether he could impose the death penalty if a person brutally beat and ultimately killed one of his children or his wife. The potential juror responded that he believed that "life without parole is a death sentence." Thereafter, he informed defense counsel that he had "been close to death" and had "learned then that life is too valuable and too precious for anyone person to sit and say, well, I don't like this person and I'll do this." He then reaffirmed his conviction that he could never consider the death penalty.
Based on the voir dire questioning of these potential jurors, the trial court correctly excused them for cause, pursuant to the analysis established in Witherspoon v. Illinois andWainwright v. Witt.
 VIII
The appellant argues that the in-court identification of him by the State's witnesses who had purchased the victim's weapons and jewelry from the appellant, was tainted by their out-of-court identification. The appellant bases this argument on his allegation that these witnesses had "too little time" to view him when they purchased the guns and jewelry from him and that the photographic arrays were prejudicial. Although the record indicates that during pretrial identification two of these witnesses were shown a number of pictures of the appellant as part of the array, one of these witnesses also testified that he was basing his identification in court of the appellant on his personal encounters with him, rather than on the pictures he saw in the photographic array. The other witness, who was shown two photographs of the appellant as part of the array, testified that the police officers did not suggest anything to him, and that, although the appellant was the only person in the array with two photographs, the photographs looked like the person who sold him the gun. The witness who purchased a ring from the appellant testified that he was shown photographs of a number of different people, but that he could not remember anything about the photographs. *Page 1338 
Although the appellant argues that this type of photographic "one man show-up" was impermissibly suggestive and although they are by their nature suggestive, they are not necessarily unduly so. Allison v. State, 485 So.2d 799 (Ala.Cr.App. 1986).
 "Alabama case law has consistently recognized that one man show-ups are an important part of efficient police work and generally show how well the police do their job. Conducted as soon as possible after the commission of the crime, they are a reliable, accurate, and constitutionally acceptable identification procedure. Hobbs v. State, 401 So.2d 276 (Ala.Cr.App. 1981); Carter v. State, 340 So.2d 94 (Ala.Cr.App. 1976); Robinson v. State, 55 Ala. App. 658, 318 So.2d 354
(Ala.Cr.App. 1975); see also, Bates v. United States, 132 U.S.App.D.C. 36, 405 F.2d 1104 (1968). An identification deprives the accused of due process of law only where the procedure used is so 'impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968). Factors which should be considered in determining whether there is a substantial likelihood of irreparable misidentification include 'the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.' Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972)."
Allison v. State, supra, at 801. See also Garth v. State,536 So.2d 173, 175-76 (Ala.Cr.App. 1988).
Each of these witnesses transacted business with the appellant and each had the opportunity to view him during the transaction. Furthermore, each of these witnesses was certain of his identification. Under the "totality of the circumstances," Garth v. State, supra, at 176, the record indicates that these identifications were accurate.
 IX
The appellant argues that certain items of evidence were improperly admitted at trial. This evidence included property that was taken from the deceased, but that was not included in the inventory of property taken from the victim. The indictment alleged only the taking of a gold chain with a medallion and a knife. However, as argued by the State, the other items were properly admitted because they were both relevant and were taken as part of the res gestae of the offense. See Welborn v.State, 580 So.2d 1 (Ala.Cr.App. 1989) (evidence that the defendant possessed forged checks, other than those charged in the indictment, was admissible to prove the requisite criminal intent); Lane v. State, 564 So.2d 90 (Ala.Cr.App. 1990) (collateral criminal activity was properly admitted when the event was part of one continuous transaction); Wright v. State,574 So.2d 1031 (Ala.Cr.App. 1990) (evidence that the defendant's wife was also arrested and charged with another offense was admissible as part of the res gestae); Dority v. State,586 So.2d 973 (Ala.Cr.App. 1991) (in a case of trafficking in cocaine, where the cocaine was found in the search of a car, marijuana, guns and crack found in the subsequent search of the house were admissible as part of the res gestae).
The determination of whether evidence is relevant and therefore admissible rests within the sound discretion of the trial court and will not be disturbed on appeal absent a showing of abuse of discretion. Jennings v. State,513 So.2d 91, 95 (Ala.Cr.App. 1987). In the present case, the evidence was properly admitted; we find no abuse of discretion by the trial court.
 X
The appellant argues that the trial court improperly refused to give two of his requested charges, which he alleges are correct principles of law and which he further alleges were not covered by the trial court's oral charge. These charges address the sufficiency of circumstantial evidence. The record indicates that the trial court's oral charge to the jury did properly cover that subject matter. Raper v. State,584 So.2d 544 (Ala.Cr.App. 1991) *Page 1339 
(instruction on circumstantial evidence was proper and fairly covered the requested charge).
The appellant also argues that the trial court unduly emphasized certain matters during his oral charge. Specifically, the appellant alleges that the trial court's statement that criminally negligent homicide is a misdemeanor unduly emphasized that particular lesser-included offense. The appellant also alleges that the trial court's statement that the matter of punishment would be dealt with at a later time unduly emphasized the issue of guilt, giving the jury "the mistaken impression that there would need to be a finding of guilt and that then punishment would be dealt with." A review of the trial court's entire oral charge reveals no such emphasis. See generally Dennis v. State, 584 So.2d 548
(Ala.Cr.App. 1991).
AFFIRMED.
All Judges concur.