**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

May 19 2014, 9:10 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**KIMBERLY A. JACKSON**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**IAN MCLEAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

GARY SISTRUNK,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　Appellant-Defendant,　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　vs.　　　　　　　　　　　　　　)　　No. 49A04-1210-CR-527
　　　　　　　　　　　　　　　　　　)
STATE OF INDIANA,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　Appellee-Plaintiff.　　　　　　　)

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Ruth D. Reichard, Senior Judge
Cause No. 49G05-1202-FB-10061

**May 19, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

Gary Sistrunk appeals his convictions for robbery and criminal confinement as class B felonies.[1] Sistrunk raises four issues, which we revise and restate as follows:

I. Whether his convictions for robbery and criminal confinement violate Indiana's prohibition against double jeopardy;

II. Whether the trial court abused its discretion in admitting certain testimony;

III. Whether the evidence is sufficient to support his convictions; and

IV. Whether the trial court abused its discretion in denying his request for an order for public funds to pay for an expert witness.

We affirm in part, reverse in part, and remand.

FACTS AND PROCEDURAL HISTORY

At some point after 5:00 p.m. on December 29, 2011, Sistrunk entered a liquor store in Marion County, Indiana, where Jackie Ellis and Cheryl McGuigan were working. Sistrunk asked Ellis for a bottle of vodka, and Ellis showed the bottle to him. Sistrunk was in the store for about fifteen minutes and left without making a purchase. At approximately 9:30 p.m., he entered the store again. At that time, Ellis was helping a customer at the lottery machine, and McGuigan was in the cooler located in the back of the store. After the customer at the lottery machine left the store, Sistrunk "pulled out a .38 revolver" and told Ellis to "give [him] the money out of both cash registers" and that if Ellis "tried to hit a panic button that he would kill [him]." Transcript at 29. Sistrunk "locked his elbow onto his hip" and pointed the gun "just like straight at [Ellis] from his

---

[1] This appeal was taken from cause number 49G05-1202-FB-10061 ("Cause No. 61"). We also issue an opinion in Sistrunk v. State, No. 49A05-1211-CR-567 (Ind. Ct. App. May 19, 2014), which is an appeal from Sistrunk's convictions for robbery and criminal confinement under cause number 49G05-1202-FB-010112 ("Cause No. 112").

2

hip." Id. at 63. Ellis opened a brown paper bag and placed all the money from both cash registers in the bag.

As Ellis was placing the money into the bag, McGuigan exited the store's cooler, and Sistrunk saw her and stated "come on out lady." Id. at 70. At that time, McGuigan did not know if Sistrunk was armed. Sistrunk ordered McGuigan to remove the money from the store's lottery machine drawer, and McGuigan did so. When Ellis finished placing the money from the cash registers in the bag, McGuigan dropped the money from the lottery machine drawer in the bag. Sistrunk took the bag of money from Ellis. McGuigan "kind of glanced down and there was something in the pocket [of Sistrunk's sweatshirt] that was heavy." Id. at 71. Sistrunk then ordered Ellis and McGuigan to enter the store's cooler and wait there for five minutes. Sistrunk stated that he did not want to hurt anybody but just wanted the money. Ellis and McGuigan entered the cooler, and McGuigan pressed a panic button. The length of time from when McGuigan exited the cooler and entered the cooler again after the robbery was "[p]robably less than 2 minutes." Id. at 71. After a minute, Ellis and McGuigan exited the cooler and dialed 911. Indianapolis Metropolitan Police Officer James Barrow and Detective Bradley Millikan responded to the robbery and spoke with Ellis and McGuigan. Detective Millikan later met separately with Ellis and McGuigan, obtained their recorded statements, and presented each of them with a photo array, and both Ellis and McGuigan identified Sistrunk as the person who committed the robbery. Police obtained video surveillance recordings[2] of the robbery.

---

[2] There were nine video cameras in the store.

On February 14, 2012, the State charged Sistrunk with: Count I, robbery of Ellis as a class B felony; Count II, criminal confinement of McGuigan (by removing her from the cooler area to the lottery machine); Count III, robbery of McGuigan; Count IV, criminal confinement of Ellis (by removing him from the register area to the cooler area); and Count V, criminal confinement of McGuigan (by removing her from the lottery machine area to the cooler area). On March 9 and March 23, 2012, Sistrunk, represented by private counsel, filed motions which requested the court to order the Marion County Public Defender (the "MCPD") to pay for the reasonable expenses of an expert witness on the issue of eyewitness identification.[3] At a pretrial conference on July 23, 2012, the MCPD indicated to the trial court that it did not support Sistrunk's request for public funds, and the court denied Sistrunk's application. On August 30, 2012, the court conducted a bench trial at which Ellis, McGuigan, Officer Barrow, and Detective Millikan testified and the State presented the video recording of the robbery. During trial, Sistrunk objected on hearsay grounds to certain testimony of Officer Barrow and Detective Millikan related to the descriptions they received during their investigation from the store employees of the person who robbed them, and the trial court overruled the objections.

The court found Sistrunk guilty as charged on Counts I, III, IV, and V, and the court entered judgment of the lesser included offense of criminal confinement as a class D felony on Count II.[4] The court sentenced Sistrunk to one and one-half years on the

---

[3] These motions were filed and the July 23, 2012 hearing was held under Cause Nos. 112, 61, 62, and 63.

[4] The court reduced Sistrunk's conviction under Count II to a class D felony because "McGuigan

class D felony and fourteen years on the class B felony convictions, with six years to be served in the Department of Correction (the "DOC"), four years served in community corrections, and four years suspended. The court ordered the sentences to be served concurrently with each other.

## DISCUSSION

## I.

The first issue is whether Sistrunk's convictions for robbery and criminal confinement violate Indiana's prohibition against double jeopardy.

A.     Criminal Confinement

The Indiana Constitution provides that "[n]o person shall be put in jeopardy twice for the same offense." IND. CONST. art. 1, § 14. The Indiana Supreme Court has held that "two or more offenses are the 'same offense' in violation of Article I, Section 14 of the Indiana Constitution, if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." Richardson v. State, 717 N.E.2d 32, 49 (Ind. 1999).

Sistrunk essentially argues that his convictions for robbery and criminal confinement violate Indiana's prohibition against double jeopardy based upon the actual evidence test.[5] Under the actual evidence test, the evidence presented at trial is examined to determine whether each challenged offense was established by separate and distinct

---

did not see a weapon, a deadly weapon, of any kind." Transcript at 139.

[5] This court has noted that "[s]imultaneous convictions of robbery and confinement charges do not violate Indiana's statutory elements test." Merriweather v. State, 778 N.E.2d 449, 454 (Ind. Ct. App. 2002) (citation omitted).

facts.  Lee v. State, 892 N.E.2d 1231, 1234 (Ind. 2008).  To show that two challenged offenses constitute the "same offense" in a claim of double jeopardy, a defendant must demonstrate a reasonable possibility that the evidentiary facts used by the fact finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense.  Id.  The Indiana Supreme Court has determined the possibility to be remote and speculative and therefore not reasonable when finding no sufficiently substantial likelihood that the trier of fact used the same evidentiary facts to establish the essential elements of two offenses.  Hopkins v. State, 759 N.E.2d 633, 640 (Ind. 2001) (citing Long v. State, 743 N.E.2d 253, 261 (Ind. 2001); Redman. v. State, 743 N.E.2d 263, 268 (Ind. 2001)).

Application of this test requires the court to identify the essential elements of each of the challenged crimes and to evaluate the evidence from the fact-finder's perspective.  Lee, 892 N.E.2d at 1234.  "[U]nder the . . . actual evidence test, the Indiana Double Jeopardy Clause is not violated when the evidentiary facts establishing the essential elements of one offense also establish only one or even several, but not all, of the essential elements of a second offense."  Spivey v. State, 761 N.E.2d 831, 832-833 (Ind. 2002).  In determining the facts used by the fact-finder to establish the elements of each offense, it is appropriate to consider the charging information, jury instructions, and arguments of counsel.  Lee, 892 N.E.2d at 1234; Spivey, 761 N.E.2d at 832.  Generally, double jeopardy does not prohibit convictions of confinement and robbery when the facts indicate that the confinement was more extensive than that necessary to commit the

6

robbery.  Merriweather v. State, 778 N.E.2d 449, 454 (Ind. Ct. App. 2002) (citing Hopkins, 759 N.E.2d at 639; Thy Ho v. State, 725 N.E.2d 988, 993 (Ind. Ct. App. 2000)).

Sistrunk specifically argues that the "security video shows approximately 70 seconds elapsed from the time the robber first confronted Ellis until the time the robber left the store" and that "[t]hat means the robber's confinement of Ellis . . . [and] McGuigan lasted less than 70 seconds . . . ." Appellant's Brief at 19.  Sistrunk argues that "[t]he robber directed McGuigan and Ellis to move to the back room or cooler to effect his escape during the robbery," that "[t]o the extent the robber required the two to move at any other time, it was to accomplish the gathering of the cash which was the subject of the robbery," and that "[t]hus, the confinement of Ellis and McGuigan was not more than required to accomplish the robbery." Id. at 20.  The State contends in part that the robberies did not require proof that Sistrunk removed McGuigan from the lottery machine to the cooler or Ellis from the register area to the cooler and that, after he obtained the store's money, his goal of taking the money had been achieved.

Robbery consists of taking property "by using or threatening the use of force" or "by putting any person in fear." Ind. Code § 35-42-5-1.  Criminal confinement consists of confining a person or removing them by fraud, enticement, force, or threat of force from one place to another. Ind. Code § 35-42-3-3.  The Indiana Supreme Court has stated that "where the confinement of a victim is greater than that which is inherently necessary to rob them, the confinement, while part of the robbery, is also a separate criminal transgression." Hopkins, 759 N.E.2d at 639.  The allegation in the charging information for robbery under Count I was that Sistrunk "did knowingly, while armed

7

with a deadly weapon, that is: a handgun, take from the person or presence of Jackie Ellis property, that is: United States currency, by putting Jackie Ellis in fear or by using or threatening the use of force on Jackie Ellis" and under Count III that he "did knowingly, while armed with a deadly weapon, that is: a handgun, take from the person or presence of Cheryl McGuigan property, that is: United States currency, by putting Cheryl McGuigan in fear or by using or threatening the use of force on Cheryl McGuigan." Appellant's Appendix at 71-72. The allegation in the charging information for criminal confinement under Count II was that Sistrunk, "while armed with a deadly weapon, that is: a handgun, did knowingly, by force, or threat of force, remove Cheryl McGuigan from one place to another, that is: from the cooler area of the business to the lottery machine." Id. at 72. The charging information for criminal confinement under Count IV alleged that Sistrunk, "while armed with a deadly weapon, that is: a handgun, did knowingly, by force, or threat of force, remove Jackie Ellis from one place to another, that is: from the register area of the business into the cooler area." Id. Count V alleged that Sistrunk, "while armed with a deadly weapon, that is: a handgun, did knowingly, by force, or threat of force, remove Cheryl McGuigan from one place to another, that is: from the lottery machine area of the business into the cooler area." Id.

The evidence reveals that Sistrunk waited for a customer to leave the store and then pulled out his gun and told Ellis to give him the money in both cash registers and that if Ellis tried to hit a panic button that he would kill him. When McGuigan exited the cooler, Sistrunk stated "come on out lady" and ordered her to remove the money from the store's lottery machine drawer, and McGuigan complied. Transcript at 70. Sistrunk took

the bag containing the money from the register and lottery machine drawers and then ordered Ellis and McGuigan to enter the store's cooler and wait there for five minutes. Sistrunk stated that he did not to hurt anybody but just wanted the money. Ellis and McGuigan entered the cooler, McGuigan pressed a panic button, and stayed there for a minute before exiting the cooler and dialing 911.

The evidence shows that the confinement of McGuigan as charged under Count II did not extend beyond what was necessary to commit the robberies and was not a separate criminal transgression from the robberies. Sistrunk's confinement of McGuigan as charged under Count II in ordering her to "come on out lady" occurred while Ellis was placing money from the register drawers in the paper bag, was coextensive with the order that she remove the money from the lottery machine drawer, and was taken to effectuate the robbery of the money from the lottery machine drawer. This confinement was not a separate criminal transgression from the robbery and did not extend beyond what was necessary to commit it. See Polk v. State, 783 N.E.2d 1253, 1259 (Ind. Ct. App. 2003) (finding that the evidence did not show that the confinement was greater than that necessary to accomplish the robbery where the defendant knocked the victim to the floor, held a gun in his hand, and demanded and took money from the victim's pocket, holding that viewing the actual evidence there existed a reasonable possibility that the robbery and confinement convictions were supported by the same evidence, and vacating the defendant's conviction for criminal confinement), trans. denied. Accordingly, we vacate Sistrunk's criminal confinement conviction under Count II.[6]

_____

[6] We need not address Sistrunk's additional contention that his conviction under Count II violates the continuing crime doctrine.

The evidence presented at trial shows that Sistrunk's confinement of Ellis and McGuigan, as charged under Counts IV and V respectively, however, extended beyond that necessary to rob them. In light of Sistrunk's actions of ordering Ellis and McGuigan to remove the money from the register and lottery machine drawers, of taking the money, and of instructing Ellis not to press a panic button, it was not necessary for Sistrunk to further require Ellis and McGuigan to enter the store's cooler as the robberies were completed. The actions taken by Sistrunk to effectuate the robberies and the actions of ordering Ellis and McGuigan to enter the cooler were separate criminal transgressions. Under the circumstances, we find no sufficient substantial likelihood, and thus cannot say that Sistrunk has demonstrated a reasonable possibility, that the trial court based its determination of guilt on the confinement counts under Counts IV and V upon the evidence used to find him guilty of robbery under Counts I and III. The confinements of Ellis and McGuigan under those counts were not coextensive with the robberies, but instead went beyond that necessary to accomplish the robberies. Accordingly, the criminal confinement convictions under Counts IV and V do not violate Sistrunk's double jeopardy rights. See Hopkins, 759 N.E.2d at 640 (holding that the defendant's confinement of his victims extended beyond what was necessary to rob them and noting that it was not necessary to force the victims into the basement or later to stay in the basement to rob them and that the confinement was a separate criminal transgression from the robberies themselves).[7]

---

[7] In support of his argument, Sistrunk points to Vanzandt v. State, in which this court concluded that the defendant's convictions for robbery and criminal confinement violated double jeopardy as there was "an absence of evidence to establish the essential elements of confinement of [the victim] independent of the robbery of [the victim]" and that "[t]he force or threat of force exerted by Vanzandt

B.    Multiple Enhancements

Sistrunk also asserts that the same evidence, namely, that he was armed with a gun, was used to elevate his robbery convictions and his criminal confinement convictions which constitutes a double jeopardy violation. His act of threatening the use of a deadly weapon was used to enhance his convictions under Counts I, III, IV, and V to class B felonies. See Ind. Code § 35-42-5-1 (governing the offense of robbery and noting the offense is a class C felony except that "the offense is a Class B felony if it is committed while armed with a deadly weapon"); Ind. Code § 35-42-3-3 (governing the offense of criminal confinement and noting that the offense is a class D felony except as provided in subsection (b) and that, under subsection (b), the offense is "a Class B felony if it [] is committed while armed with a deadly weapon").

In Miller v. State, the defendant placed a knife to the victim's throat and then later pressed the knife on her back while he committed various offenses. 790 N.E.2d 437, 438 (Ind. 2003). The defendant was convicted of burglary as a class A felony, two counts of criminal deviate conduct as class A felonies, criminal confinement as a class B felony, robbery as a class B felony, resisting law enforcement as a class A misdemeanor, and battery as a class A misdemeanor. Id. On appeal, the defendant claimed a violation of the double jeopardy provision of the Indiana Constitution because his use of a single weapon was used to elevate the sentencing classification of several of his convictions. Id.

---

against [the victim] was that exerted to accomplish the robbery." 731 N.E.2d 450, 455 (Ind. Ct. App. 2000), trans. denied. "The evidence adduced at trial disclosed that Vanzandt, armed with a handgun, ordered [the two victims] to lie down on the floor while he effected his robbery and obtained access to the getaway vehicle." Id. There is no indication that the confinement in Vanzandt went beyond that necessary to effectuate the robbery. Sistrunk ordered Ellis and McGuigan to enter the cooler and stay there for five minutes after the robberies were complete. We find Vanzandt distinguishable.

11

The Indiana Supreme Court observed that "[a]lthough not raised by the parties, we have recognized a series of rules of statutory construction and common law that supplements the constitutional protections afforded by the Indiana Double Jeopardy Clause," id. at 439 (citing Pierce v. State, 761 N.E.2d 826, 830 (Ind. 2002); Spivey, 761 N.E.2d at 834), that "Pierce applied the rule that two crimes may not be enhanced by the same bodily injury," and that "[t]his was an application of the broader rule previously expressed by Justice Sullivan prohibiting conviction and punishment 'for an enhancement of a crime where the enhancement is imposed for the *very same behavior* or harm as another crime for which the defendant has been convicted and punished.'" Id. (citing Richardson, 717 N.E.2d at 56 (Sullivan, J., concurring) (emphasis added)). The Court held that "[t]he repeated use of a weapon to commit multiple separate crimes is not 'the very same behavior' precluding its use to separately enhance the resulting convictions" and that "[r]ather, the use of a 'single deadly weapon during the commission of separate offenses may enhance the level of each offense.'" Id. (citing Gates v. State, 759 N.E.2d 631, 633 n.2 (Ind. 2001)). The Court thus declined to find error in the defendant's enhanced sentences. Id. In his concurring opinion, Justice Sullivan noted that "[w]hat justifies the multiple enhancements here is the *repeated* use of the knife by the defendant in committing crimes for which he was convicted," that "[h]ad the defendant merely been armed with the weapon while committing multiple crimes, and not actually used it (or used it only once), I think it would be improper to impose more than one enhancement," and that, "[i]n such a circumstance, the multiple enhancements would be for the 'very same behavior' and thus violate the rule against multiple enhancements to which this

12

Court subscribed in Guyton v. State, 771 N.E.2d 1141, 1143 (Ind. 2002) (citing Pierce[], 761 N.E.2d [at] 830 [], citing in turn Richardson[], 717 N.E.2d [at] 55 [] (Sullivan, J., concurring); id. at 57 (Boehm, J., concurring in result)))." Id. (Sullivan, J., concurring).

Here, Sistrunk did not repeatedly use the handgun or use it more than once in committing the offenses for which he was convicted. He pointed the gun at Ellis and ordered him to remove the money from the register drawers. At the time, McGuigan was in the store's cooler located in the back of the store. When McGuigan exited the cooler, Sistrunk ordered her to remove the money from the store's lottery machine drawer, and McGuigan complied. McGuigan testified that, at that time, she did not know that Sistrunk was armed and that she at no time saw a weapon. She also testified that she thought Sistrunk had a weapon when he reached over to take the bag from Ellis because he leaned forward and she "kind of glanced down and there was something in the pocket [of Sistrunk's sweatshirt] that was heavy." Transcript at 71. Ellis and McGuigan testified that, after Sistrunk took the money, he ordered them to enter the store's cooler and wait there for five minutes and stated he did not want to hurt anybody but just wanted the money, but neither testified that Sistrunk used the weapon at that stage. While Sistrunk was still armed with the weapon, the evidence does not show that he used it repeatedly or more than once, and thus, in light of Miller, it is improper to enhance all of his convictions based on the "very same behavior" of pointing the gun once and then remaining armed throughout the incident. As a result, Sistrunk's conviction under Count III must be reduced to a class C felony and his convictions under Counts IV and V must be reduced to class D felonies.

In sum, we remand with instructions to vacate Sistrunk's conviction for criminal confinement under Count II, to enter his conviction for robbery under Count III as a class C felony rather than a class B felony, to enter his convictions for criminal confinement under Counts IV and V as class D felonies rather than class B felonies, and to impose sentences under those counts consistent with the sentencing parameters for the appropriate class level for the felonies, to be served concurrent with the sentence imposed for his robbery conviction under Count I, which does not impact his aggregate sentence.

II.

The next issue is whether the trial court abused its discretion in admitting certain testimony of the police officers. Admission of evidence is within the sound discretion of the trial court. Davis v. State, 907 N.E.2d 1043, 1053 (Ind. Ct. App. 2009). We will reverse a trial court's decision to admit evidence only if there is an abuse of discretion. Id. An abuse of discretion occurs if the trial court's decision is against the logic and effect of the facts and circumstances before the court. Id. We will not reverse an error in the admission of evidence if the error was harmless. Turner v. State, 953 N.E.2d 1039, 1058 (Ind. 2011). Errors in the admission of evidence are to be disregarded unless they affect the defendant's substantial rights. Id. at 1059. In determining the effect of the evidentiary ruling on a defendant's substantial rights, we look to the probable effect on the fact-finder. Id. The improper admission is harmless error if the conviction is supported by substantial independent evidence of guilt satisfying the reviewing court that there is no substantial likelihood the challenged evidence contributed to the conviction. Id.

14

During trial, the prosecutor asked Officer Barrow to testify regarding the description he received from the store employees of the person who robbed them. Sistrunk's counsel objected on hearsay grounds, the prosecutor stated that the testimony would explain the officer's next step in his investigation of gathering information, and the court stated that it would allow the testimony just for that purpose and that if there was a jury it would admonish them. The prosecutor later asked Detective Millikan to testify regarding the description of the robber he received from the store employees, Sistrunk's counsel object on hearsay grounds, and the prosecutor stated the testimony was offered to explain the steps in the investigation. The court admitted the detective's testimony and stated that it would not consider the testimony as substantive evidence.

On appeal, Sistrunk claims that the trial court abused its discretion in admitting this testimony, that the statements were hearsay and no valid hearsay exception applies, and thus that the statements were inadmissible. He contends that the testimony was highly prejudicial and that it buttressed the employees' in-court identifications upon which the court relied heavily in finding him guilty. The State maintains the court admitted the challenged testimony for a limited purpose, not for the truth of the matters asserted, that Sistrunk was not prejudiced as Ellis and McGuigan testified to their observations of the robber during the robberies and confinements, and that admission of the evidence was cumulative of the employees' testimony at trial.

The record reveals that Ellis and McGuigan testified at length and that they were thoroughly cross-examined regarding their observations and perceptions of the events of the robberies and confinements and the appearance and actions of the person who

15

committed the offenses. The case was tried to the court as the trier of fact, the trial judge is presumed to know the law, and the record and the court's comments reveal that it carefully weighed the witnesses' testimony and the evidence and did not rely on the descriptions given to law enforcement during the investigation. The court specifically stated that the challenged testimony was admitted for the sole purpose of explaining the next step in the investigation and that it would not consider the testimony as substantive evidence. Sistrunk has not demonstrated that the admission of the course-of-investigation testimony buttressed the credibility of the other witnesses to the extent that it affected his substantial rights or otherwise requires reversal. There is no substantial likelihood the challenged evidence contributed to the convictions. See Craig v. State, 630 N.E.2d 207, 211-212 (Ind. 1994) (noting that the child victim testified in detail about the attack from his firsthand knowledge and that there was little to undermine the credibility of the child, and holding that the tendency of the challenged statements to bolster the child's credibility had only minor impact on the jury and accordingly that the error in the admission of the statements was harmless and did not require reversal).

## III.

The next issue is whether the evidence is sufficient to support Sistrunk's convictions. When reviewing the sufficiency of the evidence to support a conviction, we must consider only the probative evidence and reasonable inferences supporting the verdict. Drane v. State, 867 N.E.2d 144, 146 (Ind. 2007). We do not assess witness credibility or reweigh the evidence. Id. We consider conflicting evidence most favorably to the trial court's ruling. Id. We affirm the conviction unless "no reasonable fact-finder

16

could find the elements of the crime proven beyond a reasonable doubt." Id. (quoting Jenkins v. State, 726 N.E.2d 268, 270 (Ind. 2000)). It is not necessary that the evidence overcome every reasonable hypothesis of innocence. Id. at 147. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. Id.

Sistrunk contends that the identification evidence was highly conflicting, that within minutes of the robberies Ellis and McGuigan described the robber as approximately five feet seven inches tall and wearing a grey hoodie, sweatpants, and hat, that Ellis later reported the robber was six feet four or six feet five inches tall, and that at trial Ellis reported the robber as five feet seven inches tall and McGuigan described the robber as approximately five feet seven or five feet eight inches tall. Sistrunk notes that Ellis testified the robber had a goatee and very thin eyebrows and that, according to McGuigan, the robber had no facial hair and full eyebrows with no gray and no scar. Sistrunk argues that neither McGuigan nor Ellis recalled a scar on the robber's face or a tattoo on the robber's hand, both of which he had, and the police did not find a weapon or the robber's clothing while searching Sistrunk's home. He also asserts that Detective Millikan told McGuigan that police had caught the robber before he showed her the photographic array and that, after McGuigan identified Sistrunk's photograph, the detective told McGuigan to give him a high five.

The State maintains that Ellis and McGuigan unequivocally testified that Sistrunk was the person who robbed and confined them, and that the effect of Ellis's single departure from his otherwise consistent perceptions of Sistrunk's height and any subjective differences between the characterization of the thickness of his eyebrows were

17

for the trial court to resolve. The State further notes that each of the witnesses identified Sistrunk's photograph in separate interviews with Detective Millikan, that they were not shown the same array, that the other five photographs were of men who were similar in appearance to Sistrunk, that the detective told McGuigan only that police thought they caught the robber, and that Sistrunk does not explain how the exchange regarding the high five would have retroactively affected McGuigan's earlier selection of his photograph.

We note that identity may be established entirely by circumstantial evidence and the logical inferences drawn therefrom. Bustamante v. State, 557 N.E.2d 1313, 1317 (Ind. 1990). The unequivocal identification of the defendant by a witness in court, despite discrepancies between his description of the perpetrator and the appearance of the defendant, is sufficient to support a conviction. Emerson v. State, 724 N.E.2d 605, 610 (Ind. 2000), reh'g denied. Inconsistencies in identification testimony impact only the weight of that testimony, because it is the task of the trier of fact to weigh the evidence and determine the credibility of the witnesses. Gleaves v. State, 859 N.E.2d 766, 770 (Ind. Ct. App. 2007). As with other sufficiency matters, we will not weigh the evidence or resolve questions of credibility when determining whether the identification evidence is sufficient to sustain a conviction. Id. Rather, we examine the evidence and the reasonable inferences therefrom that support the conviction. Id.

The evidence reveals that both Ellis and McGuigan identified Sistrunk from a photographic array as the person who committed the offenses. Ellis and McGuigan were present at the robbery and had ample opportunity to view Sistrunk during the time he was

18

in the liquor store. Sistrunk's defense counsel thoroughly cross-examined the witnesses regarding their ability to identify him, the inconsistencies in their testimony, their abilities to observe him, his physical features, and any irregularities with respect to the presentation of the photographic arrays. The record does not show that any irregularity in presenting the photographic arrays affected the witnesses' identifications of Sistrunk's photograph. To the extent there were any internal inconsistencies in Ellis's testimony or his statements at different points after the robbery, that there were factual differences between the testimony of Ellis and McGuigan regarding the robber's appearance and Sistrunk's actual appearance, or that one or both of the witnesses noticed or failed to notice certain physical features of the robber, it was the function of the trier of fact to resolve any such possibly conflicting evidence. The court was able to consider the testimony and all evidence presented by the State regarding Sistrunk's identity.

Based upon the evidence most favorable to the convictions, we cannot say that it was unreasonable for the trier of fact to believe the identification testimony and evidence presented, and we conclude that sufficient evidence exists from which the court could find Sistrunk guilty beyond a reasonable doubt of robbery under Counts I and III and criminal confinement under Counts IV and V. See Wilder v. State, 716 N.E.2d 403, 405 (Ind. 1999) (noting that it is the duty of the fact-finder to assess the credibility of witness testimony, that all of the witnesses who identified the defendant were present at the robbery and had ample opportunity to view him, and that defense counsel thoroughly cross-examined the witnesses, and finding that the State presented sufficient evidence

from which the trier of fact could have concluded the defendant was the perpetrator of the charged offenses).

IV.

The next issue is whether the trial court abused its discretion in denying Sistrunk's request for funds for an expert witness. Sistrunk's March 23, 2012 motion stated that, in each of the four cases against him, the State's evidence would rest largely on eyewitness testimony, that none of the witnesses recognized the robber from previous interactions, that it was defense counsel's understanding that nothing found during the search of Sistrunk's house had been linked to any of the crimes, and that some of the witnesses stated they were close to one hundred percent certain that the picture of Sistrunk was of the same man that robbed them. The motion stated:

> If an expert witness were allowed to testify, defense counsel expects the expert witness would testify as follows: When people are under extreme stress, adrenaline interferes with the ability to form accurate long term memories. As a result, the ability to make an accurate eyewitness identification is reduced. When a gun is involved, the ability to make an accurate eyewitness identification is further reduced, because people have a tendency to focus on the gun rather than the face of the person holding the gun. When an individual is shown a photo lineup of individuals, the individual often picks the person that looks most like the robber. The individual then, because they are not under extreme stress, forms a new memory based on the photograph in the photo array. When asked to make an in court identification, the person uses their memory of the photo-array to make the in court identification rather than their memory of the actual robbery. Most importantly, there is little to no correlation between a testifying witnesses [sic] confidence and accuracy. In other words, a witness who testifies that they are 100% certain about ID is no more accurate than a witness who says that they are 50% certain about ID. Additionally, the testifying witness appears extremely credible. The witness is not being dishonest. The witness is merely unaware of the psychological process that has occurred in their own mind.

20

Appellant's Appendix at 92-93. The motion further stated that eyewitness testimony would be the only real substantive evidence of guilt, that according to the Department of Corrections ("DOC") it costs $20,000 to incarcerate a person for a period of one year, and if Sistrunk were sentenced to the absolute minimum and received good credit time the cost of incarceration would be $60,000. The motion also stated that the hourly rate of Dr. Roger Terry, Sistrunk's proposed expert witness, was $100 and that, if a flat fee were preferred and the cases were not joined for trial, he would charge $5,000 to review all of the evidence and to give an opinion on what factors might have affected the witnesses' ability to make an accurate identification, and if he were asked to begin preparing for testimony at trial this would cost an additional $10,000. The motion stated that security footage existed and that, depending on the quality of the footage, expert testimony regarding eyewitness testimony could become more or less helpful.

At the pretrial conference on July 23, 2012, the court stated that Sistrunk requested the court to order the MCPD to expend budgeted funds on his behalf, that it was the court's understanding there was a protocol or process that the MCPD followed in determining whether such a request would be granted, and the court asked the MCPD, represented by Robert Hill, to help with the record. Hill testified that the MCPD requires a defendant to show a legitimate need for the requested service and that budgeted funds must be available. Hill further testified that the MCPD did not have any funds remaining in its budget for the request and that he did not believe there had been an adequate showing of need and a demonstration that the requested funds would in fact be beneficial to the case. Hill indicated that an eyewitness expert is a legitimate area of inquiry in the

right case but that he did not think this was the right case. The court then stated that he had read some literature that experts in this area "will not say the witness is right or wrong" and that "[t]hey'll simply highlight the possibility of mistake," and Sistrunk's counsel agreed that the expert "raises his answers in terms of these are potential problems because he can't offer an opinion on whether or not a witness has testified truthfully." Supplemental Transcript at 70. The court denied Sistrunk's request for public funds.

Sistrunk contends on appeal that the court abused its discretion in denying his application. He argues that MCPD assigned his appeal to one of its contract appellate attorneys, that concerns over a conflict of interest may have prompted the assignment to contract counsel, that the agency should not be allowed to advocate a position which is adverse to the client, and that Hill, as chief public defender of a cash-strapped agency, had a financial interest in direct opposition to Sistrunk's interests. Sistrunk contends that, by his own admission, Hill essentially was faced with curtailing the functions of his own office or funding the expert witness request. He asserts that his inability to present expert testimony challenging the reliability of the eyewitness testimony was highly prejudicial as his convictions rested on eyewitness testimony and that, if he had been able to present the expert testimony, he very likely could have been acquitted given that the trial court apparently viewed this case as close.

The State maintains that Sistrunk has waived his claim by failing to present any argument under applicable law and makes no effort to address the merits of his request according to Scott v. State, 593 N.E.2d 198 (Ind. 1992). The State also argues in part that Sistrunk's claims regarding the trial court's procedure is waived as he never objected or

22

made any arguments against the procedure to the trial court. The State contends that, even if not waived, Sistrunk's arguments are unavailing, that the trial court decided whether to pay for Sistrunk's proposed expert, and that Sistrunk's claim that the MCPD usurped the role of the trial court is without merit. The State further argues that the trial court did not abuse its discretion in denying Sistrunk's request under Scott, that an application for an expert identification witness raises particular concerns under Scott's criteria regarding "whether the requested expert services could nonetheless be performed by counsel" through cross-examination, and that, when records such as photographs or video recordings "are present, the utility of opinion testimony regarding other eyewitness identification is greatly lessened, or even eliminated." Appellant's Brief at 35-36 (citations omitted). The State notes that defense counsel vigorously cross-examined Ellis and McGuigan as to issues which could be used to impeach their identification of Sistrunk and that nothing in the record supports his assertion that an expert witness would have made a reasonable doubt about the eyewitnesses' testimony more or less likely. In his reply brief, Sistrunk argues that identification was a critical issue in this case given the grainy security videos from which he could not be conclusively identified, that his purpose in procuring the expert witness was not exploratory, that defense counsel's cross-examination was not an effective substitute for the expert testimony as counsel was not able to convey during cross-examination the specialized information the expert would have provided, and that the primary people subject to the cross-examination, Ellis and McGuigan, were the very witnesses whose identifications were unknowingly impacted.

Indiana Evidence Rule 702 permits expert witness testimony "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." The appointment of experts for indigent defendants is left to the trial court's sound discretion. McConniel v. State, 974 N.E.2d 543, 558 (Ind. Ct. App. 2012) (citing Beauchamp v. State, 788 N.E.2d 881, 888 (Ind. Ct. App. 2003) (citing Jones v. State, 524 N.E.2d 1284, 1286 (Ind. 1988))), trans. denied. It is within the trial court's discretion to determine whether the requested service would be needless, wasteful or extravagant. Id. The trial court is not required to appoint at public expense any expert the defendant might find helpful. Id. The defendant requesting the appointment of an expert bears the burden of demonstrating the need for the appointment. Id.

The central inquiries in deciding this issue are whether the services are necessary to assure an adequate defense and whether the defendant specifies precisely how he would benefit from the requested expert services. Id. (citing Scott v. State, 593 N.E.2d 198, 200 (Ind. 1992)). A defendant cannot simply make a blanket statement that he needs an expert absent some specific showing of the benefits the expert would provide. Id. "The trial court may consider whether the proposed expert's services would bear on an issue for which expert opinion would be necessary or the request for an expert appears to be exploratory only, whether the expert services will go toward answering a substantial question or simply an ancillary one, the severity of the possible penalty the defendant faces, the cost of the expert services, and the complexity of the case." Id. at 557-558 (citing Scott, 593 N.E.2d at 200-202). The circumstances under which expert testimony

24

regarding eyewitness identification is permitted are fact sensitive and must be assessed on a case-by-case basis. Cook v. State, 734 N.E.2d 563, 570 (Ind. 2000), reh'g denied.

In Reed v. State, the defendant wished to present expert testimony on the subject of the reliability of eyewitness identification, and the trial court refused. 687 N.E.2d 209, 211 (Ind. Ct. App. 1997), reh'g denied. On appeal, the Court noted that the defendant was convicted solely upon the testimony of one witness. Id. at 212. The Court then stated:

> In Hopkins[ v. State, 582 N.E.2d 345, 353 (Ind. 1991)], the Indiana Supreme Court recognized the trend of cases recognizing the "built-in potential for error in eyewitness cases." [] The court also noted that the admissibility of such expert testimony is favored by the weight of authority. Judge Posner, in Krist v. Eli Lilly & Co. (1990) 7th Cir., 897 F.2d 293 pointed out some problems inherent in witness testimony. "An important body of psychological research undermines the lay intuition that confident memories of salient experiences . . . are accurate and do not fade with time unless a person's memory has some pathological impairment." Id. at 296.
>
> Although not taking issue with the contention that eyewitness accounts are less reliable than once thought, the Seventh Circuit, perhaps too sweepingly, noted in United States v. Larkin (1992) 7th Cir., 978 F.2d 964, 971, cert. denied (1993) 507 U.S. 935, 113 S.Ct. 1323, 122 L.Ed.2d 709:
>
>> "[E]xpert testimony regarding the potential hazards of eyewitness identification-regardless of its reliability-'will not aid the jury because it addresses an issue of which the jury already generally is aware, and it will not contribute to their understanding' of the particular factual issues posed. (citations omitted). These hazards are well within the ken of most lay jurors, and [defendant's] counsel was granted ample opportunity to discuss those hazards and cast doubt upon the witnesses' eyewitness identification of his client."
>
> The holding indicates the view that "experts" do nothing more than highlight the fact that witnesses often misidentify individuals, a concept well within the realm of understanding of the average juror.

25

Id. at 212-213. After reviewing several opinions in other states, the court held that "we suggest that trial courts might be well advised to permit such expert testimony in order to assist the jury in its evaluation of the evidence," that "[n]evertheless we are reminded that, at least with regard to experts paid from public funds, [the] defendant has the burden of demonstrating that 'the services [requested] are *necessary* to assure an adequate defense,'" that "[w]hile expert testimony is surely helpful in many cases, it will be truly necessary in far fewer instances," and that "[t]he concept that eyewitness identification is flawed or subject to serious question in a particular instance may be placed within the jury's realm of understanding by careful cross-examination and by counsel's argument to the jury." Id. at 213-214 (quoting Scott, 593 N.E.2d at 200).

In Cook, the defendant wished to present the testimony of Dr. Terry as an expert on the subject of the reliability of eyewitness identification, and the trial court did not permit Dr. Terry to testify before the jury. 734 N.E.2d at 569. The Court noted that none of the witnesses who identified the defendant was equivocal in his or her testimony and that there was more than one eyewitness and held that the trial court did not abuse its discretion in refusing to allow the expert testimony on the subject of the reliability of eyewitness identification. Id. at 571.

In Farris v. State, the defendant sought to present the testimony of Dr. Terry as an expert on the subject of the reliability of eyewitness identification, and the trial court refused. 818 N.E.2d 63, 67 (Ind. Ct. App. 2004), trans. denied. The Court initially noted that Indiana Evidence Rule 704(b) provides that "[w]itnesses may not testify to opinions concerning . . . whether a witness has testified truthfully . . . ." Id. The Court then held

that the trial court had found that, based on the evidence presented and Farris's cross-examination of the witnesses, Dr. Terry's testimony was not necessary to place the concept of eyewitness misidentification within the jury's realm of understanding" and that "[t]his was a valid ground for excluding Dr. Terry from testifying." Id. at 68. The Court also noted that there were two eyewitnesses and that "[t]heir accounts of the robbery were consistent and supported by the gas station's surveillance video" and held that the trial court did not abuse its discretion by excluding Dr. Terry from testifying. Id.

Here, Ellis and McGuigan were the sole eyewitnesses to the robberies. The record reveals that Sistrunk's defense counsel was able to thoroughly cross-examine them regarding their memories of the robberies and their identifications of Sistrunk as the robber. Specifically, Sistrunk's counsel questioned Ellis regarding his emotional state during the robberies and the fact that he was traumatized and "[s]cared to death." Transcript at 51. Sistrunk's counsel elicited testimony from Ellis regarding his observations at the time of the robbery of Sistrunk's height and appearance, the fact that Ellis wore glasses, the fact that Sistrunk had a goatee, that Sistrunk's eyebrows were thin, that Ellis did not remember seeing any scarring around Sistrunk's eyebrow or any tattoos on his right hand, and that Ellis at trial could see that Sistrunk had a scar above his eyebrow and tattoo on his right hand. Sistrunk's counsel questioned Ellis regarding his selection of Sistrunk's photograph from the array. Sistrunk's counsel questioned McGuigan regarding the emotional effect of the robberies, the fact that she was so shaken at one point that she could not open a door for an officer, and the facts that she sometimes wore glasses, that at the time Sistrunk did not have facial hair, that Sistrunk had full

27

eyebrows, and that McGuigan did not remember seeing any scarring around Sistrunk's eyebrows or any tattoos. Sistrunk's counsel also questioned McGuigan regarding her selection of Sistrunk's photograph from the array and that the detective stated "we caught the guy" and stated "give me a high five" after, but not directly after, she identified Sistrunk's photograph. Id. at 88, 92. In addition, the State admitted a recording taken from cameras at the liquor store showing the robbery which at a minimum favors a finding that the trial court did not abuse its discretion in determining that Dr. Terry's testimony was not necessary under the circumstances. See Farris, 818 N.E.2d at 68 (noting that the eyewitness accounts of the robbery were supported by the gas station's surveillance video). We also note that there were two eyewitnesses who identified Sistrunk both in court and by identifying his photograph from an array and who were unequivocal. See Cook, 734 N.E.2d at 571 (noting that the witnesses were unequivocal and there was more than one eyewitness); Farris, 818 N.E.2d at 67 (noting there were two eyewitnesses and their accounts of the robbery were consistent). In closing arguments, defense counsel argued that the witnesses were testifying to their memories of the photo array and not their memories of the night of the robberies. Defense counsel noted the discrepancies in the eyewitnesses' testimony regarding Sistrunk's appearance and the events of the robberies and claimed that the witnesses' ability to store memories was impaired, and that at the photo lineups they were trying to pick the person who looked most like the robber.

We also note that this case was tried before the court as the trier of fact, that judges are presumed to know the law, that the court's comments related to the

28

eyewitnesses' testimony regarding the robberies, their observations of Sistrunk's appearance, and the process of identifying him using the photo arrays showed that it carefully weighed the witnesses' testimony and the evidence, that the concept that eyewitness identifications may be mistaken or questionable in certain circumstances is within the realm of understanding of the court, and that additional testimony related to that concept in certain circumstances, such as here where the court was able to assess the testimony of the eyewitnesses and the video recording, may be of limited utility.

Based upon the record, Sistrunk failed to meet his burden of demonstrating that his proposed expert testimony was necessary to assure an adequate defense, and we cannot say the trial court abused its discretion in denying his request for public funds to pay for the fees of the proposed expert. See Cook, 734 N.E.2d at 569-571 (noting that none of the witnesses who identified the defendant was equivocal in his or her testimony and there was more than one eyewitness and holding that the trial court did not abuse its discretion in refusing to allow the expert testimony on the subject of the reliability of eyewitness identification); Reed, 687 N.E.2d at 211-214 (noting the concept that eyewitness identification is flawed or subject to serious question in a particular instance may be placed within the jury's realm of understanding by careful cross-examination and by counsel's argument to the jury).

To the extent Sistrunk asserts the court erred in involving the MCPD or Hill in the process of determining whether to grant his request for funds for an expert, Sistrunk did not raise the issue before the trial court and thus waived the issue. See In re Larry L. Thompson Revocable Trust, 954 N.E.2d 1056, 1061 (Ind. Ct. App. 2011) ("A party must

29

show that it gave the trial court a *bona fide* opportunity to pass upon the merits of a claim before seeking an opinion on appeal."). Waiver notwithstanding, Sistrunk does not demonstrate that the recommendation of the MCPD was based solely on budgetary grounds, that the trial court relied exclusively on the MCPD's statement and failed to evaluate the necessity of the requested expert, or that he was prejudiced by the court taking into consideration the statements made by Hill. Sistrunk is not entitled to reversal of his convictions on this basis.

### CONCLUSION

For the foregoing reasons, we remand with instructions to vacate Sistrunk's conviction for criminal confinement under Count II, to enter his conviction for robbery under Count III as a class C felony rather than a class B felony, to enter his convictions for criminal confinement under Counts IV and V as class D felonies rather than class B felonies, and to impose sentences under those counts consistent with the sentencing parameters for the appropriate class level for the felonies, to be served concurrent with the sentence imposed for his robbery conviction under Count I. In all other respects, we affirm.

Affirmed in part, reversed in part, and remanded.

ROBB, J., concurs.

BARNES, J., concurs in part and dissents in part with separate opinion.

30

# IN THE
# COURT OF APPEALS OF INDIANA

GARY SISTRUNK,                          )
                                        )
    Appellant-Defendant,       )
                                        )
      vs.                )    No. 49A04-1210-CR-527
                                        )
STATE OF INDIANA,                       )
                                        )
    Appellee-Plaintiff.        )

**BARNES, Judge, concurring in part and dissenting in part with separate opinion**

I agree with the majority's conclusions about the admission of evidence, the sufficiency of the evidence, and the expert witness funds. I also agree with the majority's conclusion that the confinement alleged in Count II was not a separate criminal transgression from the robberies and that the conviction must be vacated. Further, I agree that the confinements alleged in Counts IV and V went beyond that necessary to effectuate the robbery because, after the robberies were completed, Sistrunk ordered Ellis and McGuigan from the register area of the store into the cooler with instructions to wait there for five minutes. I, however, respectfully dissent from the majority's conclusion that Counts III, IV, and V must be reduced because of its view that Sistrunk did not repeatedly use the weapon during the commission of the crime.

31

"The repeated use of a weapon to commit multiple separate crimes is not 'the very same behavior' precluding its use to separately enhance the resulting convictions. Rather, the use of a 'single deadly weapon during the commission of separate offenses may enhance the level of each offense.'" Miller v. State, 790 N.E.2d 437, 439 (Ind. 2003) (quoting Gates v. State, 759 N.E.2d 631, 633 n.2 (Ind. 2001)). As the majority acknowledges, Sistrunk was armed with the weapon throughout the commission of these offenses. Regardless of whether he continuously wielded it, I believe that Sistrunk's possession of the gun allowed him to effectuate crimes and that Miller clearly allows for the enhancement of each offense. Although I do not dispute the majority's reading of Justice Sullivan's concurring opinion in Miller, none of the other justices joined it. As a concurring opinion, I do not believe that it is a basis for reducing Counts III, IV, and V. Accordingly, I dissent.